IN RE INTEREST OF J. N. V., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. S. V., APPELLANT.

395 N. W. 2d 758

Filed November 7, 1986.   No. 85-996.

Robert C. McGowan, Jr., for appellant.

Donald L. Knowles, Douglas County Attorney, and Elizabeth G. Crnkovich, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The separate juvenile court terminated the mother's parental rights to her now 2-year-old son, J.N.V. By her assignments of error the mother questions the sufficiency of the evidence to establish that she "substantially and continuously or repeatedly neglected" her son or that she refused to give him "necessary parental care and protection" as contemplated by Neb. Rev. Stat. § 43-292(2) (Reissue 1984). We affirm.

On July 19, 1984, the mother, without aid, gave birth to her son on the floor of her kitchen. At the time, the mother was sharing her apartment with her paramour and 7-year-old daughter. While the paramour lay sleeping on the living room couch during the birth, the daughter ran to a neighbor's home to seek assistance. The attending physician at the hospital to which the mother and her son were admitted became concerned about the sanitary conditions at the mother's apartment because both she and her daughter had come to the hospital with head lice. As a consequence, the hospital contacted the Child Protective Services office. A representative of that office inspected the apartment on July 24, 1984, and found there was no clothing or crib for the newly born son, nor was there any food for anyone else. The mother had no plans to provide for her son until she was to receive her Aid to Dependent Children check on the 1st of August. The mother was instructed by the Child Protective Services representative that before her son, who was then still hospitalized, could be returned to her, the apartment needed to be cleaned; a crib, diapers, and food provided; and that she and her daughter needed to get rid of their head lice. The mother was also provided with some items and with information to help her obtain other necessities.

As of August 13, the mother had still made no preparations for her son, who had been placed in temporary foster care. By this time her paramour had left the apartment, had taken the daughter with him, and had left the mother without any funds. The mother was apparently agitated and repeatedly stated to a visiting nurse, who was assisting the mother to prepare for her son's return, that "I don't know what to do, I don't know what to do." Concluding that the mother could not manage daily living by herself, the visiting nurse referred her to Adult Protective Services. The mother was then moved to the Booth Salvation Army Residence.

The mother expressed a desire for both of her children to be returned to her, and attempts to secure necessities for the son by nurses, the staff at Booth hospital, and others continued. With the help of her caseworkers the mother obtained Social Security and medicaid payments. However, the mother had become "immobilized" and was incapable of doing anything. Her

Adult Protective Services caseworker testified that the mother could not make decisions or any plans for her future or for her son.

In September this caseworker thought it necessary to commit the mother to the Community Mental Health Center at the Douglas County Hospital; however, the mother ultimately entered the hospital voluntarily. In October she was moved to a halfway house in Omaha. During this period, the mother visited her son at the Nebraska Children's Home until November 1984, when the home lost contact with the mother.

In March or April of 1985 the mother returned to the care of the halfway house. It is not clear exactly how long the mother's whereabouts were unknown or where the mother had been living after she returned from her disappearance, what type of therapy she was receiving, or what type of arrangements were being made to prepare her to raise her son. It does appear, however, that once her whereabouts again became known, she resumed visits with her son.

The evidence further reflects that the mother had considered the possibility of the son's foster parents adopting him. She eventually signed a relinquishment for adoption, but later withdrew it because of a disagreement as to what rights she would have with respect to her son after adoption.

The mother was diagnosed as a paranoid schizophrenic whose personal grooming had deteriorated to the point that as of October 25, 1985, 6 days before the hearing resulting in the judgment appealed from, her body odor was offensive; she did not respond to efforts to communicate with her, either individually or in groups; and she exhibited intense anger, was constantly nervous and agitated, remained entirely by herself, and threatened suicide. Long-term hospitalization was recommended, as her condition was not expected to improve in the near future. According to her attorney, at the time of the hearing she was involuntarily committed to the board of mental health. The evidence further revealed that there has been no bonding between the mother and her son, and the mother becomes anxious when performing child care duties alone.

The operative petition alleges that the son comes within the meaning of § 43-292(2). That statute provides for the

termination of parental rights when such action is in the juvenile's best interests and it appears by the evidence that "[t]he parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection."

The mother's argument is not that she is fit to be a mother but, rather, that the evidence does not establish the ground pled as the basis for terminating her parental rights. More specifically, she contends that as she at no time had physical possession of her son, she could not have neglected him and refused to give him the necessary parental care and protection contemplated by § 43-292(2).

It is true that the State might have elected to assert as a ground for terminating her rights the mother's inability to discharge her parental responsibilities because of her long-term mental illness or deficiency, § 43-292(5), or that more careful advocacy on the part of the State would have suggested that it amend its pleading by adding § 43-292(5) as a ground for the judgment it sought. However, the law on the issue of neglect is not as the mother perceives it to be.

One need not have physical possession of a child to demonstrate the existence of the neglect contemplated by § 43-292(2). In the case of *In re Interest of C.L.F.*, 216 Neb. 631, 344 N.W.2d 674 (1984), the child was born to a mother who abused drugs. The child was at all relevant times retained in the custody of the State because it was alleged that the mother would not be able to care for the child upon her release from the hospital. A rehabilitation program was established; however, the mother remained subject to the influence of drugs, did not attend all of her therapy sessions, disappeared for a period of time, and did not attend the court hearings. This court affirmed the termination of the mother's rights to the child, under § 43-292(2), for neglect.

Similarly, in *In re Interest of Wagner and Russell*, 209 Neb. 33, 305 N.W.2d 900 (1981), the parental rights of the natural father of one of the children involved were terminated. The father had never lived with or married the mother. The evidence showed that in the 3 years prior to his incarceration, the father gave no support to the child and made only seven or eight visits.

The court stated that the evidence was sufficient to show neglect and incapacity to carry out his parental responsibilities, notwithstanding the fact that the mother wanted no help from him.

In a situation not dissimilar to that presented by this case, it was held evidence that the mother suffered from chronic undifferentiated schizophrenia, as the result of which she was and would likely remain unable to care for her children, was sufficient to support a finding that her infant son was a "neglected child." *Department of Social Servs., St. Lawrence County v Joan R.*, 61 A.D.2d 1108, 403 N.Y.S.2d 368 (1978).

A parent may as surely neglect a child of whom she does not have possession by failing to put herself in a position to acquire possession as by not properly caring for a child of whom she does have possession. It would have been hazardous in the extreme to have entrusted the son's fragile life to his mother's possession, when she failed to put herself in a position to properly care for him. While it might have been kinder in these sad and unfortunate circumstances for the State to have proceeded under § 43-292(5), it was not required to do so.

We conclude from our de novo review of the record that the evidence clearly and convincingly establishes the son was substantially and continuously neglected, that the mother refused to give her son necessary parental care and protection, and that the son's best interests require that the mother's parental rights in and to him be terminated.

The judgment of the separate juvenile court, being correct, is affirmed.

AFFIRMED.

CAPORALE, J., dissenting.

While I agree that the mother's parental rights in and to her son probably must be terminated, I must nonetheless regretfully dissent. I do so because the State simply chose to ignore the fact it was dealing with a mentally ill mother who, through no fault of her own, could not care for her son, and treated her as if she were of sound mind and had consciously elected to neglect her parental responsibilities. Accordingly, I would reverse the judgment of the court below, with the instruction that the son be kept in foster care until the State

performs its task of proving its right to terminate the mother's parental rights in the manner prescribed by law.

Neb. Rev. Stat. § 43-292 (Reissue 1984) provides that the juvenile court may terminate parental rights on a variety of grounds, including when:

(2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection;

. . . .

(5) The parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period.

The statute further provides that when "termination of the parent-juvenile relationship is sought under subdivision (5) of this section, the court shall appoint a guardian ad litem for the alleged incompetent parent."

Thus, while the majority opinion makes no distinction between a mentally ill parent and one who is not, § 43-292 does make such a distinction.

There is good reason for making such a distinction. The notion of neglect contemplates the existence, among other things, of intelligence, judgment, and reason, rendering one capable of recognizing and adhering to a required standard of care. It is for that reason that in negligence actions we require a child to exercise only that degree of care which an ordinarily prudent child of the same capacity to appreciate and avoid danger would use in the same situation. *Gadeken v. Langhorst*, 193 Neb. 299, 226 N.W.2d 632 (1975).

Therefore, under the State's pleading, the real question in this case is not whether a mother can neglect a son whom she does not have in her possession but whether the mother had the capacity to neglect her son. The evidence clearly establishes she did not have such capacity and that she therefore does not come within the purview of § 43-292(2).

The evidence establishes, however, that she may come within the purview of § 43-292(5). The difficulty is that the State did not give the mother notice, through a guardian ad litem, that it

was her mental ability to be a parent which was at issue. In *Orr v. Knowles*, 215 Neb. 49, 337 N.W.2d 699 (1983), we noted, in connection with a statute empowering a court to appoint a guardian ad litem for a minor seeking an abortion, that the duties of a guardian ad litem are not coextensive with those of an attorney representing the minor. We observed that the guardian ad litem was to determine the best interests of the minor without reference to the minor's wishes.

The majority opinion ignores a statutory requirement and deprives a mentally ill mother of the valuable right to have her interests protected by a guardian ad litem. Proper notice is more than a matter of form, it is a constitutional requirement which is met only when one is advised of the matters to be considered in a manner which is fair in view of the circumstances and conditions existent at the time. *Black v. Black*, 223 Neb. 203, 388 N.W.2d 815 (1986). It is fundamentally unfair to tell a mother it is the neglect of her son which is at issue and then try her for lacking the mental capacity to carry out her parental responsibilities. See *Tuch v. Tuch*, 210 Neb. 601, 316 N.W.2d 304 (1982).

The majority's opinion, although expedient, is, in my view, legally incorrect.

KRIVOSHA, C.J., and SHANAHAN, J., join in this dissent.