IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ELLENA S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ELLENA S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KURTIS H., APPELLANT.


Filed October 1, 2019.    No. A-19-062.


Appeal from the County Court for Cass County: JOHN F. STEINHEIDER, Judge. Affirmed.

Michael Ziskey, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellant.

Sarah M. Sutter, Deputy Cass County Attorney, for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Kurtis H. appeals from the decision of the county court for Cass County, sitting as a juvenile court, terminating his parental rights to his daughter, Ellena S. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Kurtis is the biological father of Ellena (born July 2017). Breanna S. is Ellena's biological mother. The State sought to terminate Breanna's parental rights to Ellena during these same proceedings in the juvenile court, but Breanna ultimately relinquished her parental rights to Ellena. Because Breanna is not part of this appeal, she will only be discussed as necessary.

- 1 -

On July 20, 2017, law enforcement removed Ellena from her parents' custody after they were arrested (Breanna on criminal charges, Kurtis on an out-of-state felony warrant); Ellena was in the home with her parents when they were arrested. On July 21, the State filed an amended juvenile petition alleging that Ellena was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). That same day, the juvenile court entered an ex parte order granting the Nebraska Department of Health and Human Services (DHHS) continued temporary custody of Ellena; she has remained in out-of-home placement ever since.

On September 15, 2017, Ellena was adjudicated and found to be within the jurisdiction of the juvenile court pursuant to § 43-247(3)(a), based on Kurtis' admission to the allegations. The journal entry and order stated there were to be psychological and chemical dependency evaluations of Kurtis. It also stated that "[v]isitations have been terminated until further order of the court." In an October 18 disposition order, Kurtis was ordered to comply with recommendations of the psychological and chemical dependency evaluations, complete a psychiatric evaluation, complete a parenting class, maintain suitable housing and employment, abstain from the use of alcohol and all controlled substances (unless prescribed by a physician), and comply with the terms of a DHHS case plan. The order also stated "visitation suspended until further order of the court."

On April 9, 2018, the State filed an amended motion to terminate Kurtis' parental rights to Ellena pursuant to Neb. Rev. Stat. § 43-292(1), (2), (4), and (6) (Reissue 2016). The State alleged that Kurtis had abandoned Ellena for 6 months or more immediately prior to the filing of the amended motion to terminate parental rights; Kurtis had substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary care and protection; Kurtis was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is seriously detrimental to the health, morals, or well-being of the juvenile; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); and termination was in Ellena's best interests.

TERMINATION HEARING

A hearing was held on November 29, 2018, on the State's amended motion to terminate Kurtis' parental rights. Kurtis, who was incarcerated at the time, appeared telephonically. The State called four witnesses to testify, and numerous exhibits were also received into evidence. Kurtis testified on his own behalf. A summary of the relevant evidence follows.

Wendy Stevenson, a child and family specialist with DHHS, was called to Ellena's home on July 20, 2017, because law enforcement was removing her from her parents. When Stevenson arrived at the home, Ellena was being held by her mother, Breanna; Kurtis had already been taken from the home. According to Stevenson, "The home was in very poor condition"; there was a "very dirty" car seat, some blankets that were not clean, "a couple of dirty diapers" on the table, a bedroom in disarray, and the ceiling was "falling in" in one room. Additionally, law enforcement had found methamphetamine in the home. When Stevenson spoke to Breanna, Breanna stated that she did not receive any prenatal care while pregnant with Ellena, and that Ellena was born at home a little over 2 weeks prior with only Breanna and Kurtis present at the birth. Breanna also confirmed that Ellena had not yet received medical care. Breanna told Stevenson that they did not take Ellena for medical care because they were worried that Ellena would be removed from them.

Breanna reported that she and Kurtis had a previous child removed from their care in Kansas when they took the child for medical care following a home birth because that child tested positive for drugs and there were other medical issues. When Stevenson left the home, she immediately took Ellena to see Dr. Tina Scott-Mordhorst, a pediatrician.

Dr. Scott-Mordhorst has been Ellena's primary care provider since July 20, 2017. At the examination on July 20, Dr. Scott-Mordhorst was told that Ellena, just over 2 weeks old, had not received any prior medical care. Dr. Scott-Mordhorst was "thrilled" that Ellena looked as good as she did. She testified that it is recommended that a baby be seen and examined by a physician within 24 hours of birth to check for things like heart defects, metabolic disorders, jaundice, and feeding difficulties. Dr. Scott-Mordhorst's biggest concern at the time was whether Ellena had been feeding well, and her hydration and nutrition status. After a physical examination of Ellena, she had no concerns at that point. Dr. Scott-Mordhorst ordered the newborn screening test that most babies get at 24 hours; the results were normal. Dr. Scott-Mordhorst was also concerned about potential drug exposure, so she discussed drug testing with Stevenson, and let her know that Project Harmony was an appropriate place to have such testing done; Ellena's hair follicle test results were positive for amphetamine, methamphetamine, and THC. According to Dr. Scott-Mordhorst, Ellena could have been exposed to the drugs in utero or after her birth. She also said that children exposed to drugs can be at higher risk for behavioral and mental health complications, depending on when they were exposed and for how long they were exposed; "[i]t can be months or years, particularly for the behavioral health or mental health effects" to manifest. Ellena had follow up appointments each of the 2 weeks following her initial appointment; she looked good and was growing well. At that point, the plan was to start treating her as any other newborn and have health care maintenance visits at the recommended times, and then any additional sick visits as needed. At the time of the termination hearing, Ellena was "thriving."

Stevenson testified that during her time as Ellena's case manager, Stevenson had contact with Kurtis, who was incarcerated in the Cass County jail. Their first contact was on July 26, 2017, at the courthouse. At that time, they talked about Ellena's placement and Kurtis denied any wrongdoing. Their next meeting was on August 7 at the Cass County jail; DHHS children and family services specialist Molly Cunningham was also present, as she was going to be taking over the case from Stevenson. At the August 7 meeting, Stevenson asked Kurtis if he had any other children and he stated that he had six other children (but his rights to those children had been terminated). During that August 7 meeting, Stevenson offered Kurtis psychological and chemical dependency evaluations, and Kurtis agreed to participate in those evaluations; she was able to set those evaluations up through CAPstone behavioral health and they occurred in the Cass County jail later that month. Stevenson agreed that a parent's incarceration can present certain barriers or hurdles to DHHS offering services because DHHS has to abide by the rules of the jail or facility. "We have to essentially jump through the hoops that they need us to jump through to get providers in." "A lot of the time we can . . . at least get evaluations done, but beyond that . . . a lot of time we have a lot of different barriers just to people being able to come in and do services within the jail." Stevenson agreed that a limited number of providers will actually go into a correctional setting to provide services. Stevenson was not able to offer any other services to Kurtis because he was incarcerated.

Cunningham took over case management duties in early October 2017, and was the ongoing case manager at the time of the termination hearing in November 2018. In addition to accompanying Stevenson to the August 2017 meeting (at which time Cunningham gave Kurtis her business card which contained her contact information), Cunningham also met with Kurtis "at least once a month," either in the courtroom or at the Cass County jail. There was 1 month she was not able to make contact because she did not have her badge as required. As part of her visits with Kurtis, Cunningham would give him updates on Ellena.

According to Cunningham, Kurtis was transferred from the Cass County jail to a Lincoln correctional facility in October 2017, and remained there until his release in December. When Kurtis was at the correctional facility in Lincoln, Cunningham made efforts to contact Kurtis. She "reached out to the correctional center on numerous occasions to schedule a meeting with Kurtis." She said, "I left several messages the months of October, November, and December. I did not receive a phone call back. So I did resort to sending Kurtis letters [at least one or two] to try and reach out to him, and I received no reply." The letters she sent to Kurtis included her contact information. Cunningham did not receive any phone calls or messages from Kurtis while he was incarcerated in Lincoln.

Cunningham's understanding was that when Kurtis was released from the Lincoln correctional facility, he was taken to a correctional center in St. Joseph, Missouri. Because he was out of state, Cunningham was not able to visit Kurtis while he was incarcerated in Missouri, but she did send him letters and/or court reports "at least monthly." There were "a couple different occasions" where she did not send him a letter or court report because she corresponded with his case manager through the prison and asked that person to provide her information to Kurtis. She never received any phone calls, messages, or written communication from Kurtis. At the time of the November 2018 termination hearing, Kurtis was still incarcerated in Missouri.

Kurtis did complete psychological and chemical dependency evaluations in August 2017; the reports were received into evidence. The psychological evaluation recommended a psychiatric evaluation, individual therapy, parenting classes, family support, and to follow recommendations from the chemical dependency evaluation. The chemical dependency evaluation recommended that Kurtis participate in "Adult Level 2.1 IOP." Cunningham was not able to find a psychiatrist that was willing to go into the jail to complete a psychiatric evaluation. In fact, she said that DHHS had not been able to provide Kurtis with any of the services recommended by the psychological and chemical dependency evaluations because "it is very difficult to find providers to go into jails or prisons to provide services." When she met with Kurtis while he was in the Cass County jail, she did "refer him" to get involved in programs that the jail would be able to provide such as "AA or NA" meetings, and that "[t]he more he . . . got involved in the better it would be." When asked if, in her opinion, she tried and made every effort that she had been able to make, due to Kurtis' incarceration, to either get services in place or get him pointed in the right direction for services, Cunningham responded, "Yes." She had not received any information that Kurtis completed any of the recommendations of his psychological evaluation.

In Cunningham's opinion, Kurtis has not shown a continuing interest in Ellena. Kurtis has not seen Ellena since she was approximately 15 days old, at which time he was incarcerated. Kurtis made a request for visitation while he was in Cass County jail, but "that motion was denied due to the nature of the visit being behind glass." Despite Cunningham's continued efforts to try to reach

- 4 -

out to Kurtis, she had not heard from him since October 2017. And because there had been no contact, Kurtis had not made inquiries of Cunningham as to how Ellena had been doing, nor had he made additional requests for visits with Ellena at the other correctional facilities. Cunningham's concern was that Kurtis' parenting "is unknown" due to the termination of his parental rights to other children, the amount of time that Ellena had been placed out of the home, and "just his stability for himself . . . as he's been incarcerated the entirety of this case." It was Cunningham's understanding that Kurtis was scheduled to be released from incarceration in Missouri in January or February 2019. However, Cunningham believed it was in Ellena's best interests to terminate Kurtis' parental rights so that she can achieve permanency.

Ellena's foster mother testified that Ellena had been placed with her since July 20, 2017. The foster mother had not received any phone calls, letters, emails, or presents from Kurtis for Ellena.

Kurtis testified that he delivered Ellena during a home birth; to his knowledge there were no complications. He said he had nine children (eight biological) including Ellena, so he had "been through multiple different childbirths." After Ellena's birth, he and Ellena's mother "wiped [Ellena] down the best [they] could," but did not give her a bath for "two or three days because . . . that's what [Kurtis] had read on the internet and had heard from doctors." For the next 2 weeks, before she was removed from the home, Ellena "looked good" and appeared to be gaining weight, "[s]o we figured everything was fine."

Before his arrest on July 20, 2017, Kurtis was employed by his landlord; he was doing "side jobs" for the landlord and remodeling the house in which they were living in exchange for rent. Kurtis acknowledged that because of the ongoing remodel, the house was in a bit of disarray.

Prior to his arrest on July 20, 2017, Kurtis "had heard from family members that there was a possibility of a warrant [for Missouri], but [he] didn't know 100 percent for sure that it was actually in effect." When asked why there would have been a warrant for Missouri, Kurtis responded, "Because I was on parole in the state of Missouri, and . . . I didn't check in with a parole officer here in the state of Nebraska." So, Kurtis "basically violated [his] parole" by "[a]bsconding." Kurtis stated he was on parole for "a theft" that occurred in 2014. He "got a five-year sentence," the sentence was suspended, and he was placed on probation. He was on probation from February to October 2015, and then his probation was revoked because he left the state without permission. He was then incarcerated until he was released on parole on March 14, 2016. In June 2016, he left the state of Missouri without approval; this was the parole violation that led to the warrant on which he was arrested on July 20, 2017, here in Nebraska.

At the time of his arrest on July 20, 2017, a vial with methamphetamine residue was found in or around the area of the house where Kurtis was located; Kurtis testified that he was not using methamphetamine at the time. Upon his arrest, Kurtis was placed in the Cass County jail. A "Judgement of Conviction and Sentencing Order" was received into evidence and shows that on October 30, Kurtis pled guilty to possession of a controlled substance (methamphetamine) and the Cass County District Court sentenced him to 1 year of imprisonment, to run concurrent with a sentence imposed in a separate case, and then 12 months of postrelease supervision.

According to Kurtis, in mid-October 2017, he was transferred from the Cass County jail and went to the Diagnostic and Evaluation Center for "30 or 45 days," and was then placed at the Nebraska State Penitentiary. Kurtis said that he wrote "a couple of letters" to Cunningham while

he was at the Diagnostic and Evaluation Center, but did not get a response back. And he stated that he received no mail from Cunningham until he "got out of diagnostics" and placed at the penitentiary. Kurtis stated that while at the penitentiary, he had two or three phone calls with Cunningham, and that those calls took place in his prison case manager's office. In January 2018, Kurtis was transferred from the Nebraska State Penitentiary to the Missouri Department of Corrections. In Missouri, Kurtis "sent letters" to DHHS and "tried to send a couple to [Cunningham] herself," but did not get any response back. He also tried calling multiple times via a collect call, but apparently she did not answer. Cunningham was called as a witness on rebuttal. She denied having any phone calls with Kurtis and his case manager while he was incarcerated in Nebraska. And she confirmed her previous testimony that she did not receive any phone calls or letters from Kurtis.

Kurtis testified that he had been doing NA and AA classes "ever since I was incarcerated in Cass County all the way up until even now [the time of the termination hearing]." He also started a parenting class called "Inside Outside Dads" at the Nebraska State Penitentiary, but he was released from the penitentiary before he could complete the 18-week program. While in Missouri, he has enrolled in "Inside Outside Dads," "ICVC," employment skills, anger management, anxiety management, emotional empowerment, and pathways to change; at the time of the termination hearing he had certificates (received into evidence) showing that he had completed anxiety management and 300 hours of "restorative justice."

According to Kurtis, he was scheduled to be released from the Missouri department of corrections on January 22, 2019, and would be on parole at that time. As for his plans upon release, Kurtis said he had housing set up at a transitional living house in Omaha, Nebraska. He planned to get a job, continue with NA/AA classes, get into a parenting class, and work toward reunification with Ellena. He "know[s]" he and Ellena could grow a bond and that he could take care of her if given the chance.

Kurtis said that he has seven biological children besides Ellena. Kurtis has a relationship with his oldest child, a 17-year-old boy that lives in Oklahoma (that child's grandmother has a guardianship over him because the child's mother is in the military). As for the other six children, Kurtis has "no parental rights whatsoever"; he affirmed that his rights to those six children had been terminated. His rights to four of those children (Ellena's half-siblings) were terminated in "2014 or 2015." As for the other two children (Ellena's full siblings), the oldest lived with Kurtis "a month or two" before being removed, and the youngest was removed while in the hospital. Kurtis' rights to these two children were terminated in May 2016 by a Kansas court.

At the conclusion of all of the evidence, the State orally moved for leave of the court to amend the motion to terminate Kurtis' parental rights to conform with the evidence presented that day, and add an allegation under § 43-292(7) that the juvenile had been in an out-of-home placement for 15 or more of the most recent 22 months. The juvenile court granted the State leave to amend over Kurtis' objection, and stated it would like the State to amend by interlineation. Our transcript does not contain the amendment by interlineation. The court then said "[t]he amended complaint has now been amended to add the allegation pursuant to § 43-292(7)."

- 6 -

In an order filed on December 18, 2018, the juvenile court found that the State had failed to prove by clear and convincing evidence that Kurtis' parental rights should be terminated pursuant to § 43-292(4). However, the juvenile court terminated Kurtis' parental rights to Ellena after finding that statutory grounds for termination existed pursuant to § 43-292(1), (2), (6), and (7); that Kurtis was unfit to act as a parent; and that termination of his parental rights was in the child's best interests.

Kurtis appeals the juvenile court's order.

## ASSIGNMENTS OF ERROR

Kurtis assigns, summarized and restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights, (2) he was an unfit parent, and (3) termination of his parental rights was in the child's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUND FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Kurtis' parental rights to Ellena, the juvenile court found that statutory grounds existed pursuant to § 43-292(1) abandonment; (2) substantial and continuous or repeated neglect; (6) having determined child was a juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct conditions leading to determination; and (7) child out-of-home for 15 or more months of the most recent 22 months.

Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "A parent may as surely neglect a child of whom she [or he] does not have possession by failing to put herself [or himself] in a position to acquire possession as by not properly caring for a child of whom she [or he] does have possession." *In re Interest of J.N.V.*, 224 Neb. 108, 112, 395 N.W.2d 758, 761 (1986).

Kurtis has had his parental rights terminated to six other children, besides Ellena. The 2016 Kansas termination order regarding Ellena's two full siblings, received into evidence, stated that Kurtis was "unfit by reason of conduct or condition that is unlikely to change in the foreseeable future." "In that regard, . . . Kurtis . . . engaged in physical[,] mental and emotional neglect of [the

two children]"; "demonstrated a lack of effort . . . to adjust [his] circumstances, conduct or conditions to meet the needs of [the children]"; reasonable efforts of appropriate public and private child caring agencies have been unable to rehabilitate the family"; and Kurtis "failed to maintain regular visitation contact or communication with the minor children and . . . failed to carry out a reasonable plan approved by the court towards reintegration of the minor children into the parental home." And the report for the psychological evaluation Kurtis completed August 2017 for the current case notes that two of his children were removed from his care by the state of Kansas for medical neglect.

In the current case, Ellena was born at home in July 2017 and was delivered by Kurtis. For the next 2 weeks, until Ellena was removed from the home, she did not receive medical care. Breanna told Stevenson that they did not take Ellena for medical care because they were worried that Ellena would be removed from them because she and Kurtis had a previous child removed from their care in Kansas when they took the child for medical care following a home birth because that child tested positive for drugs and there were other medical issues. When Dr. Scott-Mordhorst examined Ellena, she appeared to be doing well. However, Ellena's hair follicle test results were positive for amphetamine, methamphetamine, and THC. According to Dr. Scott-Mordhorst, the drug exposure could have occurred in utero or after Ellena's birth.

At the time of his July 20, 2017, arrest on a felony warrant from Missouri, a vial with methamphetamine residue was found in or around the area of the house where Kurtis was located. Kurtis testified that he was not using methamphetamine at the time. But on October 30, Kurtis pled guilty to possession of a controlled substance (methamphetamine) and the Cass County District Court sentenced him to 1 year of imprisonment. Due to his incarceration, Kurtis was unable to provide care for Ellena. However, his incarceration alone was not the sole reason for termination. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015) (incarceration alone cannot be sole basis for terminating parental rights, but it is factor to be considered). While incarcerated in the Cass County jail, Kurtis met with DHHS workers and requested a picture of Ellena. However, after he was transferred out of the Cass County jail in mid-October 2017, and up until the time of the termination hearing in November 2018, Kurtis failed to maintain contact with DHHS, and Kurtis made no inquiries to either DHHS or Ellena's foster mother as to Ellena's well-being.

Based on the evidence we have just set forth, our de novo review of the record clearly and convincingly shows that grounds for termination of Kurtis' parental rights under § 43-292(2) were proven by sufficient evidence, and we find that Kurtis has substantially and continuously or repeatedly neglected and refused to give Ellena or a sibling of Ellena necessary parental care and protection.

We need not consider whether termination of Kurtis' parental rights was proper pursuant to § 43-292(1), (6), or (7), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S., supra*.

We note that Kurtis asserts that the only reasonable efforts provided by DHHS have been to set up a substance abuse evaluation and a psychological evaluation, and that DHHS "should not be allowed to use [his] incarceration as an excuse for not making reasonable efforts." Brief for appellant at 13. However, because we do not consider whether termination of Kurtis' parental

- 8 -

rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Reissue 2016), which requires reasonable efforts to reunify families, is not applicable to the instant case. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. *In re Interest of Andrew M. et al., supra.*

Thus, the next inquiry is whether termination of Kurtis' parental rights is in the child's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nichole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nichole M., supra.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

We acknowledge that Kurtis completed psychological and chemical dependency evaluations while incarcerated, and that DHHS' ability to provide services to him were limited. And we acknowledge his testimony as to the programs he has participated in while incarcerated. However, as noted previously, Kurtis has had his parental rights terminated to six other children since 2014 or 2015. He argues that although he previously had his parental rights terminated to other children, "that should not be some sort of scarlet letter that brands him for life as an unsuitable parent." Brief for appellant at 12. We agree, but at the same time, we cannot ignore the evidence that Kurtis, despite being aware of the severity of the consequences in those past circumstances, nevertheless failed to make necessary life changes for the sake of being able to responsibly parent Ellena. Instead of being focused on Ellena's best interests, he and Breanna elected to deliver Ellena in their home without medical assistance, and would not take her for any medical care because a previous child had been removed from their care when they took that child in for medical care following a home birth and that child tested positive for drugs. Clearly, Kurtis placed more importance on avoiding detection of drug use in his household than on the risks of such exposure to a newborn, both before and after delivery. And in fact, Ellena's hair follicle test results were positive for amphetamine, methamphetamine, and THC, which Dr. Scott-Mordhorst said puts children at a higher risk for behavioral and mental health complications which may take

months or years to manifest. Further, Kurtis did not make any genuine effort during his incarceration to maintain any kind of contact with Ellena, nor did he demonstrate any parental concern about her. At the time of the termination hearing, Ellena had been in an out-of-home placement for 16 months, and for more than 12 of those months, Kurtis did not even make inquiries as to her well-being.

Cunningham testified that it was in Ellena's best interests to terminate Kurtis' parental rights so that she can achieve permanency. We agree. Ellena deserves permanency and a safe and stable home. There was testimony that Kurtis was scheduled to be released on parole in January 2019, and Kurtis said he "know[s]" he and Ellena could grow a bond and that he could take care of her if given the chance. However, we agree with Cunningham's opinion that Kurtis has not shown a continuing interest in Ellena. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Kurtis. We further find that there is clear and convincing evidence that it is in Ellena's best interests to terminate Kurtis' parental rights.

## CONCLUSION

We affirm the order of the juvenile court terminating Kurtis' parental rights to Ellena.

AFFIRMED.