IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BABY GIRL M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BABY GIRL M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHARITA M., APPELLANT.

Filed September 29, 2020.    No. A-20-215.

Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Affirmed.

Deana D. Klein, of Dornan, Troia, Howard, Breitkreutz, Conway & Dahlquist, P.C., L.L.O., for appellant.

Natalie Killion, Deputy Douglas County Attorney, for appellee.

PIRTLE, RIEDMANN, and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Sharita M. appeals from an order of the separate juvenile court of Douglas County that terminated her parental rights to her child, Baby Girl M. For the reasons that follow, we affirm the juvenile court's order which terminated Sharita's parental rights.

BACKGROUND

PROCEDURAL BACKGROUND

Baby Girl M., born in August 2019, is the biological child of Sharita. Nyzjoni E. is also the biological child of Sharita. On August 12, the State filed a petition alleging that Baby Girl and

- 1 -

Nyzjoni were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Sharita and they were at risk for harm. Specifically, the petition alleged that the children were at risk for harm because Sharita's parental rights to her older children were terminated in a previous case before the Douglas County Separate Juvenile Court and her use of alcohol and/or controlled substances placed the juveniles at risk for harm. Also on August 12, an ex parte order for immediate temporary custody was entered providing temporary custody of the children to the Nebraska Department of Health and Human Services (the Department).

On August 20, 2019, an initial hearing was held on the State's petition. Sharita appeared at this hearing with counsel. However, she arrived late and the hearing was continued because of her tardiness. On August 27, a protective custody hearing was held. Sharita did not appear in court. After the hearing, it was ordered that the minor children should remain in the temporary custody of the Department for continued appropriate care and placement and to exclude the parental home of the mother until further order of the court.

On October 18, 2019, the State filed a supplemental petition alleging that Baby Girl and Nyzjoni were within the meaning of § 43-247(3)(a) by reason of the fault or habits of Sharita. The supplemental petition again alleged that Sharita's parental rights had been terminated in a previous case in the Douglas County Separate Juvenile Court and that Baby Girl and Nyzjoni were at risk for harm. The supplemental petition further alleged that termination of Sharita's parental rights was appropriate pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016) because Sharita has substantially and continuously or repeatedly neglected and refused to give her children or a sibling of her children necessary parental care. The State alleged that because Sharita's parental rights were previously terminated in Douglas County Separate Juvenile Court in a prior case, that reasonable efforts to preserve and reunify the family were not required under Neb. Rev. Stat. § 43-283.01 (Reissue 1998). Finally, the supplemental petition alleged that terminating Sharita's parental rights with respect to Baby Girl and Nyzjoni would be in the best interest of the children.

TERMINATION HEARING

An adjudication hearing on the amended petition and termination of parental rights was scheduled for February 14, 2020. At the hearing, the State moved to dismiss with prejudice that portion of the petition regarding Nyzjoni for the reason that she had been placed in the care of her father for several years and that the State could prove no risk of harm to her, which the court granted. The adjudication and termination hearing proceeded only with respect to Baby Girl. Sharita appeared 2 hours late into the hearing, after the first three witnesses had testified.

The State offered and the court received without objection a certified copy of a prior juvenile court case in Douglas County terminating Sharita's parental rights for her older children in 2018. At the hearing, the State called five witnesses: Miriam Grant, Amanda Hank, Clemence Mayoroum, Masego Kracke, and Cindy Johnson.

Grant was the first witness called by the State. Grant was the nurse who cared for Sharita after Sharita gave birth to Baby Girl. Grant had been a nurse for 8 years in the labor and delivery unit. She testified that based on the medical records she had concerns regarding Sharita's drug use. Following birth, Baby Girl tested positive for cocaine, amphetamines, and marijuana.

Sharita also had extreme fatigue for 2 days postpartum, which Grant testified was unusual as it usually only lasts 12 hours following delivery. While Sharita was receiving pain medication following the C-section birth, which could include drowsiness as a side effect, it was Grant's experience that the type of fatigue that Sharita was suffering was uncommon in patients who received these pain medications.

Grant observed Sharita in the hospital interacting with Baby Girl and was concerned that Sharita would be unable to care for the baby. Sharita would not feed Baby Girl without prompting. When she needed to feed the baby, Sharita offered a pacifier rather than a bottle. Sharita did not change the diaper of Baby Girl; rather, the nurses were doing so.

Due to Sharita's extreme fatigue in the hospital, Sharita would fall asleep rather than feed and change the diaper of Baby Girl. She fell asleep while nurses were attempting to educate her and often while holding her baby. The nurses would wake Sharita up, remove the baby from the bed, swaddle the baby, and place the baby in the bassinet. The nurses would also educate Sharita on the increased risks of suffocation and SIDS if she continued to co-sleep with the baby. Sharita continued doing so.

Grant was concerned about discharging Baby Girl with Sharita because of Baby Girl's positive tests for controlled substances combined with Sharita's failure to demonstrate that she could care for an infant. This concern stemmed from her observations that Sharita was unable to feed and change the baby and did not practice safe sleeping techniques.

The State called its next witness, Hank. She was an initial assessment worker for the Department when Baby Girl was born. Hank investigates cases from intakes received by the Department's child abuse hotline. She would also conduct research on whether the family had prior intakes or any criminal history, and then speak with family, victims, schools, hospitals, and anyone involved in the intake to determine what was occurring.

The Department received an intake on Sharita on August 9, 2019, but the intake was not assigned to Hank until August 12. Upon receiving the intake, Hank did her customary research by looking up Sharita in NFOCUS, a database system through the State where prior reports of child abuse and neglect, police reports, and notes by a hospital or a school are located. While researching Sharita, Hank learned that Sharita had prior terminations of parental rights for drug use, having the children exposed to a sexual predator, and a dirty home. She learned that Sharita's older children were removed from her care in 2016 and Sharita's parental rights to those children were terminated in 2018.

Hank went to the hospital to investigate further. She spoke with Grant at the hospital where she learned that both Sharita and Baby Girl tested positive for illegal drugs. Hank attempted to speak with Sharita at the hospital. However, Sharita refused to speak to Hank and told Hank that she should contact an attorney. Hank confronted Sharita at the hospital about her positive drug test and about Baby Girl's positive drug test. Sharita denied this was possible.

Hank also attempted to determine where Sharita was living. This was important to Hank because Sharita's rights had previously been terminated due to an unclean home. Sharita refused to tell Hank this information. Hank attempted to determine where Sharita was living by locating the father of another of Sharita's children. However, he was unaware where Sharita was living. Hank was unable to determine where Sharita was living, whether the environment was safe, or

who Sharita was living with. Hank was not even able to determine if Sharita had a home. Without this information, Hank was not able to say that the baby would be safe with Sharita upon discharge from the hospital.

The next witness the State called was Mayoroum who worked as a caseworker for PromiseShip. Mayoroum was assigned to Sharita as a caseworker in August 2019. Mayoroum also reviewed Sharita's case file and discovered that Sharita's baby was born with drugs in her system.

Mayoroum testified that it was difficult to communicate with Sharita throughout Sharita's time with PromiseShip, from August 2019 through December 2019. Mayoroum attempted to contact Sharita but was very rarely successful. Sharita's attorney provided an email address to Mayoroum to contact Sharita. In September or October 2019, Sharita was able to get a phone and provided Mayoroum with the telephone number. But communication remained difficult. When Mayoroum spoke to Sharita over the phone, Sharita at times had slurred speech and was irrational.

When Mayoroum was able to contact Sharita, she provided information about how Baby Girl was doing; however, Sharita did not ask any questions. In Mayoroum's experience, Sharita's response to this communication was unusual in that parents typically want to know what's going on with their child and usually ask questions.

Mayoroum also testified to the instability in Sharita's housing situation. From August until December 2019, Sharita had three living arrangements. Sharita reported that she lived in an apartment provided by Heartland Family Services but before a walk-through could be arranged, she was evicted. She moved to Lydia House but was kicked out for having a fight. She moved in with a cousin but when Mayoroum arrived to do a walk-through, Sharita would not allow her in. Mayoroum requested updates for addresses but did not receive any. Mayoroum testified that for purposes of reunification, the caseworker would need to be assured of identifiable and stable housing before the case could be closed. Additionally, from August until December 2019, Sharita did not have a job and she indicated that she was not planning on looking for one. Sharita reported that she was able to pay for her necessities through help from her friends. Throughout her time with PromiseShip, she did not provide any verification for her sources of income.

Mayoroum further testified about Sharita's participation in visitation services. Sharita used APEX as a visitation provider for approximately a month. Sharita was discharged for nonparticipation. The next provider lasted only a few weeks without any visitation occurring. Sharita was also offered chemical dependency services. She stated that she would participate only if she did not have to provide collateral information.

Mayoroum did observe Sharita with Baby Girl once, but due to the age of the baby, it was difficult to observe a bond. Mayoroum testified that Sharita did provide affection and attention to the child.

Kracke was the next witness called by the State. She is a supervisor at Release Ministries, an agency that provides supervision for visitation. Sharita was a client of Release Ministries from October 2019 through February 2020.

Kracke testified that Release Ministries is trained to provide expectations to the parent of how visitations will occur, in the first meeting with the parents. Parents are told that if there are three cancellations or no-shows then the relationship is terminated. No-shows occur when the parent confirms the visit and the worker shows up with the child, but the parent is not there.

Cancellations occur if 24 hours prior to visitation, the parent does not confirm the visitation. Visitations occur at neutral locations. Visitations could only occur if the parent could provide food. In addition, visitations were fully supervised.

Kracke testified that during Sharita's time as a client of Release Ministries, she accrued four cancellations and four no-shows. Because of the cancellations and no-shows, she was discharged unsuccessfully from visitations. Release Ministries also had a difficult time communicating with Sharita. She was often not responsive, and even when responsive, she would only provide confirmation at the last minute.

Visitations were to be twice per week for 4 to 5 hours per visit. When she participated in visitations with Release Ministries, Sharita provided food, diapers, and wipes for Baby Girl. Again, she showed affection for Baby Girl. And there were no reported safety concerns.

The final witness called by the State was Johnson. Johnson is a case manager supervisor at St. Francis Ministries, the organization succeeding PromiseShip for providing management for ongoing cases. In her role, she was trained to look at several factors to consider when making an assessment about parental fitness and whether termination of parental rights was in the best interest of the child. Johnson was the supervisor for Sharita's case and Johnson met with her in person in January 2020.

Johnson met with Mayoroum in December 2019 to discuss Sharita's case. After that meeting, Johnson reviewed Sharita's case file. In her review, Johnson learned there had been approximately 12 intakes since 2005 involving Sharita. She learned about the prior termination of parental rights for Sharita as well. Johnson testified that Sharita's parental rights were terminated to four other children. Based on her review of the docket, Johnson testified that Sharita's rights were terminated due to concerns about drug use and allowing inappropriate adults to have contact with her children, including past sexual abuse.

Johnson met with Sharita in January 2020 at Sharita's cousin's residence. Johnson testified that this location was not portrayed to be Sharita's permanent housing situation. During this meeting, Johnson encouraged Sharita to complete a chemical dependency evaluation which Sharita declined. Following that meeting, Sharita did not provide any verification of housing. Nor did Sharita provide any verification of employment. Johnson further testified that Sharita's nonparticipation in visitation services led to her unsuccessful discharges.

Johnson testified as to her opinion regarding whether Sharita is fit to be a parent to Baby Girl. Ultimately, Johnson concluded that Sharita was not fit because she had not been working with providers, was not engaged in chemical dependency treatment, and did not participate in voluntary services. She concluded that termination of Sharita's parental rights would be in the best interest of the child. She noted that in the prior termination case, Sharita had been asked to submit to drug tests 72 times and only provided a sample 10 times. Sharita had been unsuccessfully discharged from three visitation agencies. She did not submit to a chemical dependency evaluation or treatment. Finally, she was unsuccessfully discharged through a peer to peer service that was provided through St. Francis Ministries. Johnson testified that Sharita had not made any changes to her behavior that resulted in the previous terminations of her parental rights or which led to the filing of the present case. Johnson did not believe that Sharita showed that she can be a safe and protective parent for Baby Girl.

On cross-examination, Johnson conceded that Sharita's lack of participation in services does not necessarily speak to her motivation to be a parent. Johnson further conceded that the services offered were voluntary, so Sharita was not required to follow through with these services. However, in Johnson's opinion, the voluntary services are highly recommended and lack of participation does speak to a parent's motivation.

Johnson also testified as to the visitation reports that she reviewed for Sharita and Baby Girl. Sharita brought food and diapers for Baby Girl. Sharita appropriately cared for Baby Girl. And there were no safety concerns. Johnson conceded that there was no direct evidence that Sharita was using drugs during this time, as no testing had been accomplished because the services were voluntary. On redirect, Johnson noted that in the prior case, Sharita was required to complete numerous programs and treatment and failed to complete them.

## JUVENILE COURT'S ORDER

On February 26, 2020, the juvenile court entered an order adjudicating Baby Girl to be within the meaning of § 43-247(3)(a) and terminating Sharita's parental rights. The court found that the State had proven that termination of Sharita's parental rights was warranted pursuant to § 43-292(2) and that termination was in the child's best interest. The court further found that Baby Girl was a minor child under the meaning of § 43-283.01 and reasonable efforts to reunify the minor child with the mother were not required. Sharita appeals from the juvenile court's order.

## ASSIGNMENTS OF ERROR

On appeal, Sharita alleges that the juvenile court erred in finding that there was sufficient evidence to prove that Sharita substantially and continuously or repeatedly neglected her child; the juvenile court erred in finding that reasonable efforts to reunify the minor child were not required; and termination of Sharita's parental rights was in the child's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

### STATUTORY FACTORS

The bases for termination of parental rights in Nebraska are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Sharita's parental rights to Baby Girl, the juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2). The relevant portion of § 43-292 provides as follows:

The court may terminate all parental rights . . . when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

In her brief on appeal, Sharita asserts that the juvenile court erred in finding that termination of her parental rights is warranted pursuant to § 43-292(2). Contrary to Sharita's assertions, upon our de novo review of the record, we find that the State presented clear and convincing evidence to prove that termination of Sharita's parental rights to Baby Girl is warranted pursuant to § 43-292(2). The evidence presented at the termination hearing showed that Sharita has failed to provide both Baby Girl and Sharita's older children with necessary parental care and protection. Specifically, Sharita failed to put herself in a position or provide an environment that would allow Baby Girl to return to her care.

Sharita argues that she could not have neglected Baby Girl because immediately following birth, Baby Girl was placed in the custody of the State and Sharita only had sporadic opportunities of visitation to prove her ability to care for her. But a parent does not need to have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). See *In re Interest of J.N.V.*, 224 Neb. 108, 395 N.W.2d 758 (1986). "A parent may as surely neglect a child of whom she does not have possession by failing to put herself in a position to acquire possession as by not properly caring for a child of whom she does have possession." *Id.* at 112, 395 N.W.2d at 761. Moreover, a parent who has failed to provide an environment to which his or her children can return can be shown to have committed substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). We also recognize that one's history as a parent speaks to one's future as a parent. *In re Interest of Sir Messiah T. et al.*, *supra*.

The Nebraska Supreme Court upheld the termination of parental rights of a biological mother in a similar situation to Sharita in *In re Interest of Joseph S. et al., supra*. There, the biological mother agreed to a voluntary out-of-home placement of the children while she participated in rehabilitative services but demonstrated a consistent pattern of noncompliance. She worked voluntarily with Nebraska Families Collaborative with the goal of returning the children to the home. As part of this arrangement, she was subjected to random drug testing in which she tested positive three times. When the drug testing was increased to eight times per month, the biological mother was unable to complete the drug testing and only submitted to drug testing once or twice. In an unannounced visit less than 10 days prior to the expiration of the agreement, the caseworkers showed that the home was in disarray.

She was inconsistent in her visitations to the point where her relatives were unwilling to continue supervising visits and was noncompliant when visitations were arranged through a third party, resulting in the discharge of this service. Near the end of the voluntary placement, she requested to have visitations at a friend's house because she no longer had her own residence. The

Supreme Court upheld the termination of her parental rights finding that there was clear and convincing evidence that she substantially and continuously or repeatedly neglected to provide the children necessary parental care and protection.

Here, Sharita failed to put herself in a position to have Baby Girl return to her. To accomplish this goal, Sharita needed to demonstrate that she had an ability to care for Baby Girl. To do so, she was given the opportunity to participate in chemical dependency and mental health services, maintain a stable residence and source of income, participate with the visitation services, and demonstrate abstinence from controlled substances.

Baby Girl was placed in the custody of the State based on her positive test for cocaine, methamphetamine, and THC, and due to Sharita's prior terminations of parental rights to four older children. Caseworkers and managers attempted to provide chemical dependency services and other services to assist Sharita. They believed they were necessary to show that Sharita was correcting the problems that led to her prior terminations and to show that her home would be safe for Baby Girl. While these services were voluntary, participation in these services or the lack thereof speaks to the motivation of the parent. Although there is no direct evidence that Sharita was continuing to use drugs following the birth, she tested positive for drugs at the time of delivery. Mayoroum noted that she had slurred speech during phone calls and was irrational. Her previous terminations were based in part on her drug use. And she refused to participate in any services related to chemical dependency.

Moreover, she failed to provide a safe environment for Baby Girl to return to. The caseworkers and managers were unable to verify Sharita's address or inspect her residence throughout this case. Unlike in *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015), where the caseworkers found the home in disarray, here the caseworkers were unable to inspect her residence at all. At times Sharita refused to disclose where she was living. When Mayoroum did try to inspect the residence where Sharita was living, Sharita refused to let her in. When Johnson went to visit Sharita in January 2020, Sharita indicated that this residence was not where she would be permanently. In short, she had no stable residence.

Additionally, none of the caseworkers were able to verify her sources of income. Sharita showed no interest in seeking employment. She instead relied on friends and family for support. There was no indication of any ability to provide adequate financial support for her child.

Sharita had been discharged from visitation services for lack of participation. Like in *In re Interest of Joseph S. et al., supra*, Sharita was inconsistent with her visitations. She was discharged from Apex due to lack of participation. She either cancelled or no-showed eight times during the time period from October 2019 until February 2020 with Release Ministries. Further, she was difficult to communicate with. From August until December 2019, Sharita was relying on, at most, updates from a case manager about how her child was doing in foster care on those occasions when they could reach her. She was either nonresponsive or would respond at the last minute to verify visitations with Release Ministries. While she did provide appropriate care during fully supervised visits at neutral locations, she did not demonstrate a long-term ability to care for Baby Girl because she never put herself in a position for Baby Girl to return to her.

In short, Sharita never took any initiative to demonstrate that she could provide safety or stability to Baby Girl. Coupled with her past history of termination of parental rights, her failure

to take any proactive steps toward demonstrating competency as a parent, or to address her substance abuse and mental health issues support the juvenile court's findings that her parental rights should be terminated. Sharita failed to put herself in a position to safely allow Baby Girl to return to her care. Therefore, we affirm the juvenile court's ruling that the State presented clear and convincing evidence that termination of parental rights was warranted under § 43-292(2).

## REASONABLE EFFORTS

Sharita argues that the juvenile court erred in finding that reasonable efforts to preserve and reunify the family have failed within the meaning of § 43-292(6). However, the court made no finding of termination pursuant to § 43-292(6). The court did find that the reasonable efforts normally required before out of home placement under § 43-283.01 were unnecessary because of the prior involuntary termination of parental rights to her prior born children, thus invoking the exception found within subsection (4)(c) of that statute. We find no error in the juvenile court's finding under § 43-283.01. We need not address Sharita's reasonable efforts argument under § 43-292(6).

## BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which is caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries; but each examines essentially the same underlying facts as the other. *Id.*

Section 43-292 does not expressly use the term "unfitness" but that concept is encompassed by the fault and neglect described in subsections 1 through 6 where applicable, and, for all subsections, by a determination of the child's best interests. *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). In examining the best interests of the child, it is appropriate to look at repeated failures to provide a safe, stable, and drug-free environment for the children. See *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). The best interests of the child analysis is forward-looking, focusing on the future well-being of the child rather than entirely based on a parent's past conduct. *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013).

In her brief on appeal, Sharita argues that the State did not meet its burden in proving that she was an unfit parent and as such, the State did not meet its burden to show that terminating her parental rights were in Baby Girl's best interests. She asserts that the court relied on testimony from Mayoroum about parental fitness being based on thinking it is okay for a baby to be exposed to drugs. Sharita further argues that Johnson's testimony about fitness was based on Sharita's

failure to follow through with voluntary services. She notes that the testimony of those who observed her visits with her baby recounts proficient and proper interaction.

We disagree with Sharita's contention. In our de novo review of the record, we find that there is clear and convincing evidence that it is in the best interests of Baby Girl for Sharita's parental rights to be terminated. Our best interests analysis closely follows our analysis regarding whether the State met its burden of proof regarding § 43-292(2). As discussed above, Sharita failed to take the needed rehabilitative steps to put herself in a position to have Baby Girl returned to her. She failed to demonstrate that she could provide a safe environment for Baby Girl. This showing of neglect demonstrates that Sharita is unfit. Thus, the presumption of Baby Girl maintaining her relationship with Sharita is rebutted.

Second, there is clear and convincing evidence that the future well-being of the child is not best served by Sharita maintaining her parental rights. Sharita does not have a safe or stable residence. Sharita has no employment or other reliable source of income. She is dependent on friends and family to provide for her basic necessities. She demonstrated no desire to look for a job. Moreover, Sharita repeatedly refused to participate in mental health and substance abuse services and consistently failed to appear for visitations. She never took the initiative to inquire about her daughter's health or welfare. In sum, while Sharita was capable of providing appropriate care while in a supervised setting, her actions demonstrate little hope that she will be able to provide such care outside of a closely controlled setting.

Sharita has expended little effort to address and fix the problems that led to the previous terminations including issues of substance abuse, stable and clean housing, and stable income. Caseworkers and managers were unable to determine what type of environment Baby Girl would live in if placed with Sharita and unable to determine what type of people may be included in this environment. From the record before us, there is little indication that Sharita is willing to commit herself to the changes needed to safely care for her child in the foreseeable future.

Therefore, we agree with the juvenile court that it is in the best interests of Baby Girl for Sharita's parental rights to be terminated.

CONCLUSION

For the reasons discussed above, we agree with the juvenile court's ruling that the State proved by clear and convincing evidence that grounds for termination of Sharita's parental rights to Baby Girl exist under § 43-292(2); that a showing of reasonable efforts prior to removal of the child from the mother were not required; and that termination was in the best interests of Baby Girl.

AFFIRMED.