IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AMELIA C. & ANAYA C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AMELIA C. AND ANAYA C.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHERYL C., APPELLANT.

Filed August 11, 2020.    No. A-19-1013.

Appeal from the Separate Juvenile Court of Lancaster County: TONI G. THORSON, Judge. Affirmed.

Jonathan M. Braaten and Mona L. Burton, of Anderson, Creager & Wittstruck, P.C., for appellant.

Patrick Condon, Lancaster County Attorney, and Maureen E. Lamski for appellee.

Michelle Paxton, guardian ad litem, and Jared Holzhauser, Senior Certified Law Student, of University of Nebraska College of Law Children's Justice Clinic.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Cheryl C. appeals the Lancaster County Separate Juvenile Court order terminating her parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and finding that termination was in the minor children's best interests. Based on the analysis set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

Cheryl is the adoptive parent of Anaya C., born in February 2006, and Amelia C., born in December 2009. In October 2017, the State filed an adjudication petition alleging Anaya and Amelia were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a)(3) (Reissue 2016) because they lacked proper parental care by reason of the faults or habits of Cheryl or were in a situation dangerous to life or limb or injurious to their health or morals because (1) Cheryl was aware of inappropriate sexual contact between one of the minor children and an adult but failed to report it or take action to ensure the child's safety; (2) Cheryl used unsafe restraints or methods of restraint on one of the minor children that could have resulted in an unsafe situation for the child; and (3) Cheryl failed to provide proper or necessary care, supervision, and protection of the children, all of which placed the children at risk of harm. The State later filed an amended petition alleging that (1) Cheryl had made claims of abuse toward one or more of the children and/or abuse by one of the children but failed to be consistent in the claims and her actions regarding those claims; (2) Cheryl exhibited a pattern of failing to protect the children especially in the persons she allowed around the children; and (3) Cheryl exhibited a pattern of making claims that were inconsistent and/or did not comport with reality regarding behavior problems, abuse, physical illnesses, physical issues such as allergies, and/or reporting historical data about the children. The children were removed from Cheryl's care on October 20, 2017, and placed in the temporary custody of the Department of Health and Human Services (DHHS). Anaya and Amelia have remained in foster care since that time.

In March 2018, the juvenile court adjudicated Anaya and Amelia based on Cheryl's admissions to the allegations contained in the adjudication petition. Cheryl was ordered to complete a psychological evaluation as arranged by DHHS and sign releases allowing DHHS to access information from the evaluation, and DHHS was required to arrange for Cheryl and the children to receive services based on the recommendations contained in the evaluation.

In June 2018, the juvenile court entered an order requiring Cheryl to maintain a legal means of support, maintain a safe and stable living environment, participate in a full psychological evaluation, a parenting assessment, and a medication assessment, and complete a parenting class and demonstrate skills learned from the parenting class. The juvenile court also ordered that DHHS arrange for Amelia to undergo genetic testing to confirm whether she suffered from syndromes impacting her development. Additionally, the juvenile court allowed supervised visits between Cheryl and Amelia but continued with suspended visitation between Cheryl and Anaya.

After numerous attempts to obtain a psychological assessment as further documented below, in December 2018, the juvenile court ordered Cheryl to complete an evaluation with Dr. Nicholas Giles as arranged by DHHS. However, because Dr. Giles was unable to take on Cheryl's case, and after contacting other therapists, DHHS made a referral for Dr. Theodore DeLaet in early 2019. Following Dr. DeLaet's evaluation, the juvenile court ordered DHHS to provide Cheryl with services recommended in Dr. DeLaet's psychological and parenting assessment. On March 28, the State filed a motion to terminate Cheryl's parental rights alleging statutory grounds under § 43-292(2), (6), and (7) and that termination was in Anaya's and Amelia's best interests.

## 1. TERMINATION HEARING

The termination hearing was held in June 2019. Testimony was adduced from family service specialists, Kellie Carlin (served as specialist in October 2017), Jasna Tubanovic (served as specialist from approximately November or December 2017 to April 2018), and Carolyn Simon (served as specialist from May 2018 to termination hearing); from Anaya and Amelia's therapist Katy Hilgenkamp; and from the psychologist who performed Cheryl's psychological assessment, Dr. Theodore DeLaet.

### (a) Evidence Which Led to Removal

Carlin testified that in October 2017, she investigated a report alleging that Cheryl's brother sexually abused Anaya and that, separately, Cheryl duct-taped Anaya's hands together and used a bungee cord to lock Anaya in her room. Anaya's testimony corroborated these allegations. When Carlin arrived at Cheryl's residence, Cheryl told Carlin that Anaya had a history of running away from home, suffered from hallucinations, was provocative, had sexually abused Amelia, and was so aggressive that Anaya could not be around other children. Cheryl explained to Carlin that Anaya was taking medication for her anxiety and depression and that Cheryl had arranged for Anaya to take birth control pills to control her hormones and behavior. Cheryl also informed Carlin that Amelia suffered from medical conditions including microcephaly, fetal alcohol syndrome, Ehlers-Danlos, lactose intolerance, hypermobility of her joints, as well as a high risk of seizures and aortic aneurisms.

When Carlin removed the children from Cheryl's care, Cheryl instructed Anaya to carry Amelia to the car because Amelia's muscles get sore very easily. However, after Carlin brought Amelia to the Foster Care Closet, Amelia began running around, bouncing off the bean bag pillows, doing cartwheels, and did not appear to be in any pain. Carlin arranged supervised visits, assisted Cheryl in setting up a neuropsychological evaluation with Dr. Robert Arias, and discussed individual therapy with Cheryl and Barb Dewey, a therapist. Carlin also set up therapy for Anaya with Hilgenkamp.

### (b) Cheryl's Psychological Assessment

Tubanovic assumed the role of Cheryl's family service specialist in approximately December 2017. Tubanovic testified that, at that time, Cheryl had met with Dr. Arias, a clinical psychologist, for the completion of a psychological assessment, but that Cheryl was refusing to continue working with Arias, requiring Tubanovic to find another provider who would perform an assessment for Cheryl. While searching for a replacement psychologist, Tubanovic learned that Cheryl had privately hired Dr. Stephanie Peterson to perform the court-ordered psychological assessment. In response, Tubanovic provided Dr. Peterson with certain collateral information to consider in connection with the assessment. Although Dr. Peterson eventually completed the assessment and issued a report, and despite the court order requiring completion of a psychological assessment, Cheryl refused to release the results of her psychological evaluation to DHHS. As a result, toward the end of February 2018, Tubanovic attended a team meeting that focused on the need to obtain the psychological assessment in order to formulate a case plan and set up services for Cheryl. At that time, Cheryl was seeing a therapist, Barb Dewey, who recommended that Cheryl work with Dr. Diane Marti to obtain the psychological assessment.

In April 2018, DHHS requested that Dr. Marti complete a psychological and parenting assessment for Cheryl. Cheryl cooperated in obtaining this assessment and Dr. Marti submitted her report in November 2018. Following the release of the report, Tubanovic expressed concern that Dr. Marti failed to consider certain collateral information in connection with Cheryl's assessment, including whether Cheryl suffered from "factitious disorder" and whether Dr. Marti was being improperly influenced by Dewey. In response to these concerns, the juvenile court ordered Cheryl to complete a new evaluation.

In connection with that order, DHHS contacted Dr. DeLaet and requested a full psychological evaluation and parenting assessment. Dr. DeLaet agreed and completed his report in April 2019. Dr. DeLaet testified that he considered some of Dr. Marti's psychological data but did not find her parent assessment methods or conclusions valid because she used older versions of personality measures and noted a major variance in how she evaluated parenting issues. Dr. DeLaet's evaluation noted that "[Cheryl] is college educated and has adequate cognitive abilities to be able to understand and make changes in her life." Dr. DeLaet observed that her Full Scale Intelligence Quotient was 116, which falls within the above average range. In the parenting risk assessment, Dr. DeLaet found Cheryl's quality of judgment seemed to be impaired or significantly lower than expected for someone of her intelligence level.

Dr. DeLaet testified that he diagnosed Cheryl with depression and anxiety, and listed three rule-out diagnoses for social anxiety, unspecified personality disorder, and the presence of factitious disorder imposed on another, formerly referred to as Munchausen by proxy. Dr. DeLaet explained that "[a] rule-out diagnosis means it's not confirmed or I'm not sure, but it appears likely and merits further examination beyond what the evaluation could do on that day." Dr. DeLaet testified that Dr. Arias' prior evaluation also mentioned factitious disorder imposed on another person as a diagnostic possibility. Dr. DeLaet explained that individuals suffering from factitious disorder imposed on another claim that "other people have medical problems or psychological problems that have not been medically substantiated."

In Dr. DeLaet's evaluation, he referred to his concerns with a possible fraudulent medical letter allegedly authored by a "Mandy Harris, MD" pertaining to alleged health issues involving Amelia. The letter indicated that Harris, who was employed at IU Health Physicians Riley Child Neurology in Indiana, diagnosed 7-year-old Amelia with "fetal alcohol syndrome with characteristic features" and suggested referral to a geneticist for Ehlers-Danlos syndrome testing. The letter concluded with a hand-written signature. In connection with the letter, Dr. DeLaet opined:

> [T]he issue of the fictitious letter and who authored it is important. In addition, the fact that [Cheryl] submitted such a letter to be used in her court case is additionally problematic. If the court determines that [Cheryl] was the author of this or conspired in some way to have the letter created for her to submit in her juvenile court case, this is highly pathological and problematic. . . .
>
> The multiple times [Cheryl] has told others of the many problems each of the children has without apparent medical documentation of these disorders is concerning. If she is held responsible for the fictitious letter regarding the assessment in 2017 regarding Amelia, this would confirm the diagnosis of Factitious Disorder.

In April 2019, Cheryl sent an email admitting she, not Mandy Harris, authored the letter. The following month, a team meeting was held to discuss Cheryl's email and to review the results of Amelia's genetic testing. During this team meeting, Cheryl again admitted to writing the fictitious letter, but also stated that she did not believe she had factitious disorder. However, after Cheryl was advised that genetic testing results established that Amelia did not have fetal alcohol syndrome, Ehlers-Danlos, or Marfans, Cheryl responded that if that was correct then she would be the happiest person in the room.

At the time of the June 2019 termination hearing, Dr. DeLaet testified he was able to confirm the diagnosis of factitious disorder imposed on another due to Cheryl's admission to authoring the "Dr. Mandy Harris" letter. Dr. DeLaet explained that, from a risk assessment and treatment perspective, understanding why a person has factitious disorder becomes very important, and because he did not have enough information to determine why Cheryl has this disorder, Dr. DeLaet opined that Cheryl was at a high risk to repeat the same kind of behaviors. Dr. DeLaet described the diagnosis as manageable, not curable, which affected his treatment recommendations which included Cheryl receiving information to internalize the diagnosis and participating in therapy to understand why she has this disorder. Dr. DeLaet expounded that psychiatric medication would comprise one component of Cheryl's treatment plan, but the majority of her treatment would involve therapy where Cheryl would need to be informed of the children's actual medical diagnoses and resolve the differences between her perceptions of the children's diagnoses and their actual medical conditions. Dr. DeLaet testified that Cheryl's admission that she wrote the fictitious letter was significant and a "step in the right direction" for being aware of the problem. However, he also noted that the change in diagnosis from the time he completed his evaluation to the termination hearing only affected the clinical side, not the "parenting risk side," and the overall prognosis is that Cheryl is at a moderate to high risk for future child maltreatment of her children based upon her condition. Dr. DeLaet opined that Cheryl does not have an appreciation of what she needs to do in order to be in a position to parent her children.

Dr. DeLaet further testified about the psychological impact to a child who experiences mistreatment from a parent that suffers from this condition. He explained that a parent will favor one child and make another a "scapegoat" for the favored child. Dr. DeLaet explained that this type of abuse or neglect substantially impacts a child's perception of fitting in or not fitting in and negatively affects their ability to achieve in school or on intelligence testing. Dr. DeLaet described an additional psychological impact to a child who has visitation or continued contact with a parent diagnosed with factitious disorder who is not engaged in rehabilitative services, stating it could cause retraumatization that would need to be managed and might create another problem where the child feels he or she cannot talk about being abused or maltreated.

(c) Therapy for Children

Hilgenkamp, a mental health practitioner, testified that she worked with Anaya and Amelia in therapy. Hilgenkamp explained that she first started treating Anaya for issues related to neglect and abuse in the home. Hilgenkamp explained that Anaya's actions of shutting down her behaviors and her inability to identify her feelings were consistent with a child who has experienced trauma; however, Anaya did not display conduct consistent with physically or sexually assaultive behaviors. After a few sessions, Hilgenkamp recommended that visits between Anaya and Cheryl

cease and noticed that after visits stopped, Anaya was able to open up more, began to develop a sense of identity, and began to identify her thoughts and feelings. Over time, Hilgenkamp observed Anaya making progress from being emotionally shut down to opening up and describing what she had experienced. At the time of the termination hearing, Hilgenkamp still believed visitation with Cheryl was not in Anaya's best interests.

Hilgenkamp testified therapy sessions between Anaya and Cheryl were never arranged because Anaya never progressed to the point of recovery where she would be able to have a meaningful session with Cheryl. Hilgenkamp testified Anaya yearns for a sense of safety and stability, which Hilgenkamp opined was being met by Anaya's foster parent. However, Hilgenkamp testified that Anaya would suffer emotionally adverse effects if she were to continue to remain in foster care without permanency because she would not feel safe to process the abuse that has occurred. Hilgenkamp testified that returning Anaya to live with Cheryl would be detrimental to Anaya's mental health.

Hilgenkamp also testified about her interactions with Amelia during therapy. Hilgenkamp explained that Amelia began to disclose more of her thoughts and feelings but became avoidant if asked to clarify her feelings. Hilgenkamp also noted that, after working with Amelia from July 2018 to the June 2019 termination hearing, Amelia had not developed a rapport with Hilgenkamp, which she believed stemmed from Amelia's fear of backlash because she was still having visitation with Cheryl. When asked about her observation of Cheryl and Amelia's relationship, Hilgenkamp explained that it seemed superficial and included a lot of gifts and foods of Amelia's choice.

After Hilgenkamp had worked with both children individually, she arranged for therapy sessions between Anaya and Amelia. During these sessions, the children had poor physical boundaries and wanted to continually engage in horseplay and Anaya would go along with whatever Amelia said to avoid conflict. During one of the sessions, Hilgenkamp observed Anaya touch Amelia's shoulder with her foot, to which Amelia responded by screaming and yelling for thirty minutes that Anaya had hurt her. Anaya tried to engage Amelia in a discussion about what transpired. Specifically, Hilgenkamp testified:

> And Anaya was very quick to take responsibility and was quite willing to say, Yes, she kicked Amelia . . . because that is what Amelia had said that Anaya had done. But what Anaya had done is actually tapped her foot on her body, on her shoulder probably. . . . It absolutely was not a kick. It was not aggressive. It was an invasion of personal boundaries, but it was not aggressive or hostile at all.

Hilgenkamp testified she worked with the children on cooperation, that their relationship is now more mutual, and that Amelia had learned to negotiate. Hilgenkamp testified that based upon her experience as a therapist and her experience working with Anaya and Amelia, she suspected that Anaya's reaction to Amelia was related to the trauma Anaya had experienced and was consistent with the dynamics in the family as it has been explained to her.

Hilgenkamp also testified that, in response to Cheryl's inquiries about what Cheryl could do to help the children, Hilgenkamp suggested Cheryl write them letters clarifying Cheryl's responsibility for the abuse that occurred and how Cheryl believed it affected Amelia and Anaya. Hilgenkamp testified that Cheryl's letter to Anaya was vague and was not specific to the events that occurred in the home and that it could have been written "by anyone to anybody about

anything." When Hilgenkamp asked Amelia if she wanted to know what was in Cheryl's letter, Amelia responded that she did not care. Even though Cheryl wrote letters to both Anaya and Amelia, Hilgenkamp did not share them with the children because she believed they would not benefit from seeing the letters and Amelia specifically expressed disinterest in discussing the letters.

(d) Other Testimony

Along with testimony governing Cheryl's psychological assessment and therapy provided for the children, there was other testimony from the family specialists relating to the court-ordered services and requirements and opinion testimony governing the best interests of Amelia and Anya.

Although the family specialists acknowledged that Cheryl completed parenting classes, continued to participate in them, attended a majority of visitations with Amelia, and maintained a safe and stable home, the specialists separately opined that termination of Cheryl's parental rights was in the children's best interests. Specifically, although Cheryl attended parenting classes, Simon testified that she had concerns with allowing future unsupervised time with Amelia because Cheryl did not exhibit new learned behaviors during her parenting time.

Simon testified that terminating Cheryl's parental rights was in the best interests of the children citing the need for permanency in their lives. Simon noted the children had been in out-of-placement care for 20 months and lingering in foster care is not in the best interests of any child. Additionally, Simon testified that because Cheryl has not addressed her mental health issues in order to safely parent, Simon believed reunification with Anaya would result in the same behaviors that led to the present case. Simon opined Cheryl would be unable to provide a stable home environment that would not be harmful to Anaya because "[Cheryl] has consistently, throughout the year that I have been on the case, referred to Anaya negatively, blaming, excusing her behavior by deflecting it to Anaya." Hilgenkamp also testified that returning Anaya to Cheryl's home would be detrimental to Anaya's mental health. Regarding Amelia, Simon testified that Cheryl would not be able to provide a safe environment due to Cheryl's unaddressed mental health issues, her history of abuse, and identifying medical conditions for Amelia. Hilgenkamp further testified that both children have experienced a "prior ruptured relationship" which necessitated them to have permanency in their lives.

2. JUVENILE COURT ORDER

Following the termination hearing, the juvenile court entered an order finding that termination of Cheryl's parental rights was proper pursuant to § 43-292(2), (6), and (7) and that termination was in Anaya's and Amelia's best interests. The juvenile court noted the maltreatment of the children in this case stemmed from Cheryl's mental illness. The juvenile court articulated that "[a]s recommended by a therapist [Cheryl] wrote an 'apology' letter to Anaya acknowledging some of her abusive conduct" calling it "'old-fashioned' discipline, minimizing her conduct. Despite being involved in therapy with a therapist of her choice [Cheryl] has not demonstrated progress in correcting or even really recognizing the behavior adjudicated."

The juvenile court also observed that DHHS made reasonable efforts to correct Cheryl's unfitness by arranging for Cheryl to complete an evaluation with Dr. Arias. Although Cheryl failed to complete the evaluation process, Dr. Arias was able to author a report identifying areas of

concern concerning Cheryl's mental health including the possibility that Cheryl had factitious disorder. The juvenile court opined that "[h]ad [Cheryl] at that time cooperated with the complete evaluation, accepted the diagnosis, and entered into treatment additional efforts could have been made to address the cause of her unfitness." The juvenile court also noted that DHHS made efforts to obtain a diagnosis and specific treatment recommendations, but Cheryl did not fully cooperate with those efforts until the court issued an order requiring Cheryl to work with Dr. DeLaet to perform an evaluation.

The juvenile court found Dr. DeLaet's testimony and opinions reliable and uncontroverted. The juvenile court noted that regarding future maltreatment of the children, Dr. DeLaet was of the opinion that "as compared to other parents who have been adjudicated to be abusive or neglectful [Cheryl] had more risk factors and more severity than other adjudicated parents such that [Cheryl] warranted the designation of moderate to high risk for future problems." Dr. DeLaet also opined that Cheryl's prognosis was poor and the juvenile court noted, "[a]s expressed by Dr. DeLaet 'even if a parent is able or willing to engage in services it may not be in the child's best interest to have contact.'" Ultimately, the juvenile court determined the children needed time to heal, and it was in the children's best interests to terminate Cheryl's parental rights so the children could have permanency with parents who could provide for their safety and well-being. Cheryl has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Cheryl assigns as error, restated and renumbered, that the juvenile court erred in (1) finding that Cheryl has substantially and continuously or repeatedly neglected and refused to give the minor children necessary parental care and protection, (2) finding that reasonable efforts were taken to preserve and reunify the family, (3) improperly basing its decision to terminate Cheryl's parental rights on Cheryl's mental illness even though the State did not allege mental illness as a basis to terminate parental rights, and (4) finding that termination was in the minor children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*.

## V. ANALYSIS

### 1. TERMINATION PURSUANT TO § 43-292(2)/STATUTORY BASIS

In her first assignment of error, Cheryl argues that the court erred in finding that she substantially and continuously and repeatedly neglected and refused to give her children necessary parental care and protection in violation of § 43-292(2).

In its order terminating Cheryl's parental rights to Anaya and Amelia, the juvenile court found termination was supported by three separate statutory grounds: § 43-292(2) (parent has substantially and continuously or repeatedly neglected and refused to give juvenile necessary

parental care and protection); § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family have failed to correct conditions leading to determination); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months). Although Cheryl does not contest the juvenile court's termination of her parental rights pursuant to § 43-292(7), for completeness, we briefly address termination pursuant to § 43-292(7).

Here, Anaya and Amelia were removed from Cheryl's care and placed in the temporary custody of DHHS on October 20, 2017. At the time the State filed its motion to terminate on March 28, 2019, Anaya and Amelia had remained in out-of-home care for 17 months, and they have not been returned to Cheryl's home. Our de novo review of the record shows that grounds for termination of Cheryl's parental rights under § 43-292(7) was proven by clear and convincing evidence.

Because we have found there were sufficient grounds for termination under § 43-292(7), a matter which Cheryl does not contest, we need not consider whether termination of Cheryl's parental rights was proper pursuant to the other subsections of § 43-292 since any one ground of the eleven identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Accordingly, Cheryl's first assignment of error fails.

## 2. REASONABLE EFFORTS

Cheryl next argues that the court erred in finding that reasonable efforts were taken to preserve and reunify the family. The requirement that reasonable efforts be made to reunify the family is found in Neb. Rev. Stat. § 43-283.01 (Supp. 2017). However, its application here was resolved by this court in *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002), wherein, after similarly finding that termination of parental rights was appropriate under § 43-292(7), this court held that an appellate court need not consider the sufficiency of evidence of other statutory provisions, including § 43-283.01. Specifically, this court stated:

Furthermore, we note that because we do not consider whether termination of Kathleen's parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Reissue 1998), which requires reasonable efforts to reunify families, is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. *In re Interest of DeWayne G. & Devon G.,* [263 Neb. 43, 638 N.W.2d 510 (2002)]. In considering when the issue of reasonable efforts under § 43-283.01 must be reviewed by a juvenile court, the Nebraska Supreme Court stated: "When § 43-283.01 was adopted, the Legislature at the same time amended selected statutes in the juvenile code to indicate the specific stages within juvenile proceedings during which the juvenile court must consider reasonable efforts to preserve and reunify families pursuant to § 43-283.01." 263 Neb. at 53, 638 N.W.2d at 518. The court identified the following statutes which were amended: Neb. Rev. Stat. §§ 43-284, 43-254, and 43-1315 (Reissue 1998) and § 43-292(6).

The court then found that the issue of reasonable efforts if required under § 43-283.01 must be reviewed by the juvenile court in the following situations: (1) when

removing from the home a juvenile adjudged to be under subsections (3) or (4) of § 43-247 pursuant to § 43-284; (2) when the court continues a juvenile's out-of-home placement pending adjudication pursuant to § 43-254; (3) when the court reviews a juvenile's status and permanency planning pursuant to § 43-1315; and (4) when termination of parental rights to a juvenile is sought by the State under § 43-292(6). *In re Interest of DeWayne G. & Devon G., supra.*

Since we have determined that termination was proper pursuant to § 43-292(7) and that the State need only establish one of the statutory grounds enumerated in § 43-292, § 43-283.01 is not relevant to our determination in the instant case.

*In re Interest of Andrew M. et al.*, 11 Neb. App. at 87-88, 643 N.W.2d at 407-08.

Similarly, Cheryl's argument that the court erred in failing to find that the State failed to use reasonable efforts here meets the same fate. This argument fails.

### 3. MENTAL ILLNESS NOT PLED

Cheryl next argues that the court erred in improperly basing its decision to terminate Cheryl's parental rights on her mental illness even though the State never alleged a violation of § 43-292(5), which provides for termination when "parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." Again, Cheryl's assignment of error has been previously addressed and resolved.

In *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 30-31, 863 N.W.2d 803, 811-12 (2015), the Nebraska Supreme Court held:

[The mother]'s sole assignment of error in both cases Nos. S-14-550 and S-14-564 is that her due process rights were violated because the State was "allowed to proceed" to termination under a ground other than § 43-292(5) when it was aware she had a mental illness that affected her ability to parent. Section 43-292(5) allows termination of parental rights when "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period."

This court rejected a similar argument in *In re Interest of J.N.V.,* [224 Neb. 108, 395 N.W.2d 758 (1986),] a case in which the parental rights of a parent who had been diagnosed with paranoid schizophrenia and required longterm hospitalization were terminated on the ground of neglect pursuant to § 43-292(2). In a divided opinion, the majority concluded that "[w]hile it might have been kinder . . . for the State to have proceeded under § 43-292(5), it was not required to do so." [*Id.* at 112, 395 N.W.2d at 761.]

Although the parent in *In re Interest of Zanaya W. et al.* asked the Court to reverse the holding of *In re Interest of J.N.V.* in light of the dissent filed therein, the Nebraska Supreme Court found that the requested challenge was not preserved for appellate review. Cheryl likewise requests a reversal of the holding in *In re Interest of J.N.V.*; however, as to this court, under the doctrine of "stare decisis," we must follow the precedent of the Nebraska Supreme Court. *Martinez v. International Paper Co.*, 27 Neb. App. 933, 937 N.W.2d 875 (2020) (under doctrine of stare

- 10 -

decisis, lower courts must follow precedent of higher appellate courts). Accordingly, we adhere to established precedent and determine the juvenile court did not err in terminating Cheryl's parental rights based upon a subsection other than (5) of § 43-292, notwithstanding Cheryl's mental illness. This assignment of error fails.

### 4. BEST INTERESTS

In Cheryl's final assignment of error, she argues the juvenile court erred in finding that termination of her parental rights was in her children's best interests. Cheryl argues that because DHHS failed to timely obtain an evaluation to address her mental illness and that the State filed a motion to terminate her parental rights before DHHS received Dr. DeLaet's evaluation and recommendations it failed to prove termination now was in the children's best interests. She also makes a solitary statement that DHHS failed to intervene when "there were warning signs that Cheryl's therapist was incompetent," but fails to further explain or make any arguments regarding this statement. Brief for appellant at 25.

Before specifically addressing Cheryl's specific assignments, we begin by repeating the underlying basis for the best interest analysis. In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*
>
> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).
>
> In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Further, the evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the child or children, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

Here, the record reflects Anaya and Amelia were removed from Cheryl's care due to the State's allegations that Cheryl made claims of abuse toward one or more of the children and/or abuse by one of the children but failed to be consistent in the claims and her actions regarding those claims; Cheryl exhibited a pattern of failing to protect the children especially in relation to persons she allowed around the children; and Cheryl exhibiting a pattern of making claims that were inconsistent and/or did not comport with reality regarding behavior problems, abuse, physical illnesses, physical issues such as allergies, and/or reporting historical data about the children. Based upon Cheryl's admission to these allegations, and after adjudicating Anaya and Amelia as children within the meaning of § 43-247(3)(a), the juvenile court ordered Cheryl to, among other things: (1) participate in a full psychological evaluation, parenting assessment, and medication assessment; (2) complete a parenting class and demonstrate skills learned from the parenting class; (3) participate in supervised visits with Amelia; and (4) maintain a safe and stable living environment and a legal means of support.

Although Cheryl complied with some of the juvenile court's orders, she failed to complete and/or allow DHHS to have access to a full psychological evaluation report until April 2019 despite being afforded the opportunity to work with two therapists from late 2017 to April 2018. After reviewing the record, it is evident that part of the delay that Cheryl argues hindered her, actually occurred as a result of her own actions. The record indicates DHHS arranged for Dr. Arias to perform Cheryl's evaluation and that Dr. Arias met with Cheryl prior to December 2017. After their meeting, Cheryl chose not to work with Dr. Arias any further, but Dr. Arias was still able to author a report identifying the possibility that Cheryl had factitious disorder. In the meantime, Cheryl hired another therapist, Dr. Peterson, to perform an evaluation, and DHHS provided Dr. Peterson with collateral information to assist in completing the evaluation. However, DHHS was later denied access to the evaluation because Cheryl refused its release. This prompted DHHS to contact multiple therapists to inquire if they could perform an evaluation for Cheryl, which did not culminate in a complete psychological and parenting evaluation until Dr. DeLaet completed his evaluation in April 2019. Dr. DeLaet's evaluation indicated he needed to rule out a diagnosis of factitious disorder imposed on another and noted Dr. Arias had previously reached the same conclusion. Cheryl's unwillingness to cooperate with and complete her evaluation with Dr. Arias, combined with her refusal to release Dr. Peterson's evaluation, and DHHS' difficult task of finding a suitable alternative to perform the assessment, resulted in a delay of the treatment that Cheryl needed to address her mental health issues.

Dr. DeLaet, who completed Cheryl's psychological and parenting assessment in April 2019, confirmed that Cheryl had factitious disorder based on her admission that she wrote a fraudulent letter regarding Amelia's health, which Dr. DeLaet opined was "highly pathological and problematic." Further, Dr. DeLaet noted he did not have enough information to determine why Cheryl suffers from this disorder leaving her at a high risk to repeat the same type of behaviors. Dr. DeLaet described the diagnosis as manageable, not curable, and recommended Cheryl's treatment plan include psychiatric medication with the majority of her treatment involving therapy.

We find it compelling that Dr. DeLaet described his change in diagnosis from the time he completed his evaluation to the termination hearing as only affecting the clinical side, not the parenting risk side. As it relates to the latter, Dr. DeLaet opined that Cheryl's overall prognosis was a moderate to high risk for future child maltreatment. Dr. DeLaet further opined Cheryl does

not understand what she needs to do in order to be in a position to parent Anaya and Amelia and that the psychological impact on a child who is subjected to the type of abuse or neglect from a parent who suffers from factitious disorder substantially impacts a child's perception of fitting in or not fitting in, negatively affects his or her ability to achieve in school or on intelligence testing, could result in retraumatization, and might create another problem where the child feels he or she cannot talk about being abused or maltreated. Based upon Hilgenkamp's testimony, the record is clear and convincing that both Anaya and Amelia and suffered from that abuse.

Further, although Cheryl attended the majority of visits with Amelia and there were no safety concerns during those visits, Cheryl never progressed to unsupervised visits pursuant to recommendations from Amelia's therapist and concerns regarding Cheryl's failure to demonstrate new learned behaviors from her participation in parenting classes.

The facts of this case, which include Cheryl's lack of progress in addressing her mental health issues are somewhat similar to *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). While the record in *In re Interest of Alec S.* indicated the mother had not complied with court orders, the record also established the mother had mental health issues and failed to consistently attend treatment and address the problem. As a result of her failures, the Nebraska Supreme Court noted:

> The evidence demonstrates that [the mother] is unfit and that termination of her parental rights is in Alec's best interests. There is no dispute that [the mother] has mental health issues, but she has failed to consistently attend treatment for the problem. Ratliff testified that structure was vital and necessary to improve the symptoms of Alec's attention deficit hyperactivity disorder, but there was no evidence that [the mother] was capable of providing stability for Alec. Even more problematic is that 17 months after the case began, [the mother] still lacked an understanding of why Alec was unsafe or why she needed to engage in the services offered to show that she could provide for Alec. She had sufficient opportunity to comply with the reunification plan within the 15-month condition contained in § 43-292(7), which "'serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves.'" But she failed to do so. We recognize that [the mother] had made some progress toward her goals, but her actions appear to have been prompted by the filing of the motion to terminate her rights. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights.
>
> . . . .
>
> Alec deserves permanency. [The mother]'s failure to comply with the court-ordered rehabilitation plan defeated his chance to be reunified with her. At the time of the hearing, Alec had been in the State's care for 21 months. During that time, [the mother] had not even progressed to being allowed unsupervised visitation with Alec. Because much progress must still be made before [the mother] would be trusted with Alec's care and custody, Alec would be left to languish in foster care for an unknown amount of time with no guarantee of reunification. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. We conclude that the State showed by

clear and convincing evidence that termination of Brenda's parental rights was in Alec's best interests.

*In re Interest of Alec S.*, 294 Neb. 784, 796, 797-98, 884 N.W.2d 701, 708-09 (2016).

Here, we are again confronted with a situation in which the children had been removed for more than 19 months at the time of the termination hearing with no progress in relation to Cheryl's underlying mental health condition, while the children made appreciable progress while separated from Cheryl. In relation to Cheryl's lack of progress, the record specifically establishes that, in October 2017, when Anaya was only 11 years old, she was removed from Cheryl's home due to allegations that Cheryl had allowed her to be exposed to inappropriate sexual contact and had improperly restrained Anaya with duct tape and using a bungee cord to lock her in her room. Further, Cheryl has not had visits with Anaya and her visits with Amelia have not progressed from supervised visits due, at least in part, to Cheryl's failure to understand the issues in this case and lack of understanding regarding how to parent her children and which caused Dr. DeLaet to opine that Cheryl is at a moderate to high risk for future child maltreatment. Further, as of the June 2019 termination hearing, Cheryl had made no progress in relation to her mental illness and Dr. DeLaet opined she remained a risk to her children and neither Dr. DeLaet nor any other expert provided any indication that Cheryl could timely progress to a point where the children could be reunited or even obtain unsupervised visitation in the foreseeable future and delays in obtaining therapy were occasioned by Cheryl's own conduct.

Hilgenkamp, Anaya and Amelia's therapist, testified that placing Anaya in Cheryl's care would be detrimental to Anaya's mental health. She further testified that Anaya's yearning for a sense of safety and stability is being met by her foster parent but that Anaya would also suffer emotionally if she were to remain in foster care without permanency because she would not feel safe to process the abuse she has experienced.

The evidence also reflected that due to Cheryl's unaddressed mental health issues, she would not be able to safely parent Anaya and Amelia in the future. She would be unable to provide a stable home environment for Anaya because Cheryl has continually referred to Anaya negatively and in a manner to excuse Cheryl's own behavior. Likewise, Cheryl would be unable to provide a safe environment for Amelia, due to Cheryl's unaddressed mental health issues, her history of abuse, and identifying medical conditions for Amelia.

Simon testified that reunifying the children with Anaya would result in the same behaviors that led to the present case; the children had been in out-of-placement care for 20 months and lingering in foster care is not in the best interests of any child; and permanency would be achieved by terminating Cheryl's parental rights, which he testified was in the best interests of the children. Similarly, Hilgenkamp testified that both children have experienced a "prior ruptured relationship" which necessitated them to have permanency in their lives.

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Anaya and Amelia have been in foster care since October 2017 and deserve stability in their lives. Cheryl is either unable or unwilling to rehabilitate herself and has been unable to appropriately protect and parent the children. Accordingly, we find there was

clear and convincing evidence to show that Cheryl is unfit and that terminating her parental rights was in the best interests of Anaya and Amelia.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Cheryl's parental rights.

AFFIRMED.