IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AMAULO Q. & ANIYAH Q.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AMAULO Q. AND ANIYAH Q.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

v.

BREANNA Q., APPELLANT.

Filed April 27, 2021.    Nos. A-20-548, A-20-549.

Appeals from the County Court for Phelps County: TIMOTHY E. HOEFT, Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Natalie G. Nelson, Deputy Phelps County Attorney, and John Sauder for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Breanna Q., natural mother of Aniyah Q. and Amaulo Q., appeals the termination of her parental rights. Breanna contends the Phelps County Court, sitting in its capacity as a juvenile court, erred in: (1) allowing expert testimony by a therapist concerning Breanna's ability to parent and meet her children's needs without proper foundation; (2) finding Breanna failed or refused to take advantage of the services offered by the Department of Health and Human Services (DHHS) to correct issues or attain goals set forth in the court-ordered case plans; and (3) finding that termination was in her children's best interests. Based upon the analysis set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

On July 9, 2018, DHHS received an intake regarding Aniyah, born in November 2012, and Amaulo, born in June 2015, because of the presence of drugs in their parents' home. On July 10, 2018, Breanna was arrested and charged with possession of methamphetamine, but later pled to an amended charge of attempted possession and was placed on probation. Breanna violated her probation and was incarcerated from July 2019 until September 4, 2019. The children's father relinquished his rights to both children prior to the termination proceeding and is not part of this appeal.

Also on July 10, 2018, the State filed a petition alleging that Aniyah and Amaulo, came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Breanna. The same day, the children were removed from their parents' home. The children have remained with the same foster parents since their removal and have never returned to Breanna's care.

In August 2018, an amended petition was filed alleging the children were in a situation dangerous to life or limb or injurious to their health or morals due to being in a home where multiple items of drug paraphernalia with methamphetamine were found. In August, the court adjudicated the children as coming within the meaning of § 43-247(3)(a) pursuant to Breanna's admission.

### 1. TERMINATION PROCEEDINGS

On July 30, 2019, the State filed a petition to terminate Breanna's parental rights to both children pursuant to Neb. Rev. Stat. § 43-292(2), (3), and (6) (Reissue 2016), alleging that Breanna has substantially and continually neglected and refused to give the juveniles necessary parental care and protection; that Breanna had neglected to provide the juveniles with necessary subsistence, education, and other care necessary for the juveniles' health, morals, and welfare; that reasonable efforts to provide remedial services and rehabilitative programs to keep the family together were unsuccessful; that Breanna's continued custody would result in serious emotional or physical damage to the children; and that termination was in the children's best interests.

A termination hearing was held in February 2020 during which testimony was adduced from witnesses including Breanna; Sonia Coates and Natasha Koch, DHHS family support workers; Mara Stamp, Breanna's probation officer; and Sheri Blaha, the children's therapist. The court received into evidence a certified copy of the stipulation for visitation requirements previously entered by the court, Breanna's evaluation from South Central Behavioral Services, Breanna's inpatient treatment discharge summary, and five case plans and court reports dated from August 28, 2018, to September 12, 2019. The bulk of the evidence adduced at trial related to Amaulo's health conditions, the well-being of the children, and Breanna's failure to comply with various court orders governing services and rehabilitative programs designed to reunite the family including requirements that Breanna maintain safe housing, obtain employment, manage her drug addiction, participate in therapy to address domestic violence issues, and attend supervised visitation.

(a) Amaulo's Health Conditions

Amaulo, who was 4 years old at the time of the termination hearing, was born prematurely, had open-heart surgery when he was 2 weeks old, and was born with a breathing condition known as stridor. The record indicated that Amaulo's stridor condition involved "the two flaps above the umbilical cord [which], since he was born premature . . . didn't have time to develop and thicken. So when he would breathe in, [the flaps] would collapse on each other and cause him to [make] a high pitch[ed noise] . . ." Despite doctors informing Breanna that Amaulo received a permanent "failure to thrive" diagnosis due to his heart condition, Breanna stated that when Amaulo was removed from her care at 2 years old, he was meeting appropriate developmental milestones.

Breanna's testimony was contradicted by family support worker Coates. Coates reviewed Amaulo's medical records and noted that Amaulo had a feeding tube for his first 4 months as an infant; however, after the feeding tube fell out, doctors were unable to insert a replacement because Amaulo missed multiple appointments. Coates also testified that when Amaulo came into DHHS' care, he had severe medical issues including heart problems, breathing problems, and hemangiomas which are defined as "a usu[ally] benign tumor made up of blood vessels that typically occurs as a purplish or reddish slightly elevated area of skin." Merriam-Webster's Collegiate Dictionary 579 (11th ed. 2014). Amaulo had also been diagnosed with "failure to thrive." During Amaulo's first month in foster care, his breathing condition became noticeable when activities caused him to wheeze and cough to the point of vomiting on a daily basis until he was treated by a doctor who put him on inhalers and an antacid.

After entering foster care, Amaulo had monthly checkups with Omaha doctors for his heart and lungs, attended physical therapy and occupational therapy appointments twice per week due to developmental delays, and met with specialists who prescribed medication for his hemangiomas. Doctors also gave Amaulo special drinks to help him gain weight and allowed Amaulo "free range" eating, meaning he could eat whenever he was hungry and could eat whatever he wanted, which required Amaulo's foster mother to feed him little bits of food all day and into the night. Coates testified that Breanna attended only one of Amaulo's medical appointments despite being authorized to attend appointments and being offered transportation assistance and gas vouchers. Coates explained she had concerns that Breanna either would not, or could not, bring Amaulo to his monthly medical appointments in Omaha because Breanna had previously failed to attend local appointments for Amaulo's 4-month, 6-month, and 10-month followup appointments.

Koch also expressed concern about Breanna missing Amaulo's appointments because Amaulo must attend medical appointments to address his many medical needs. Koch elaborated that since the case began, Amaulo had 45 medical appointments, and from the February 4 and 5, 2020, termination hearing to May 1, he had an additional 37 medical appointments scheduled.

Additionally, family support workers testified that during team meeting discussions addressing Amaulo's medical needs, past appointments, and future appointments, Breanna did not ask questions that would indicate a concern for Amaulo's medical conditions.

(b) Compliance With Court Orders

The court entered various orders which required Breanna to (i) maintain safe housing, (ii) obtain employment, (iii) manage her drug addictions through medication or a mental health

provider, (iv) attend supervised visitations, and (v) complete sessions with a therapist to address domestic violence issues.

Coates testified that Breanna attended 12 of the 20 monthly team meetings. Even when Breanna was in jail and during inpatient treatment, Coates met with Breanna to review the case plan goals. Coates testified the services outlined in the case plan would have benefitted Breanna by putting her in a position to parent her children, but that overall, Breanna made minimal to no progress toward correcting the conditions that brought about the present case.

### i. Maintain Safe Housing

The evidence established that from July 2018 to June 2019, Breanna either lived in a trailer home or resided with a friend to whom she did not pay rent or utilities. In June 2019, Breanna briefly resided with another friend until she was jailed in July for violating her probation. Breanna remained in jail until September 4, when she was furloughed to attend inpatient treatment. Breanna was discharged from inpatient treatment on September 23 for fraternizing with other residents. After being discharged from inpatient treatment, Breanna moved into the Kearney Village Transitional and Sober Living facility (Kearney Village) until January 2020. She then began living in a house with financial assistance from her mother, who also struggles with methamphetamine addiction, and struggled to pay rent, utilities, groceries, and to meet her basic needs.

From July 2018 to October 2019, Coates was unable to perform a walkthrough of Breanna's home to determine if visitation could occur there. Coates testified Breanna continually had DHHS family support services available to her to assist with housing but did not regularly participate in family support and failed to meet the goal of providing her children with a safe and secure living environment.

### ii. Obtain Employment

Breanna, who does not have a high school diploma or GED, testified that she worked for Cabela's from approximately September to December 2019 and had started working a part-time job a week prior to the termination hearing. Breanna admitted that the income from her part-time employment was insufficient to meet her expenses and that she was looking for a second job and was receiving financial assistance from her mother. Family support workers testified that between July 2018 to October 2019, Breanna held a job which she attended on two occasions, that probation interfered with Breanna's ability to work, and that although support workers discussed further employment with Breanna during team meetings, Breanna never asked for assistance in obtaining employment nor indicated a reason why she was unable to work.

### iii. Manage Drug Addictions

During the termination hearing, Breanna admitted that she used methamphetamine at the commencement of this case, but stated that she has not used any controlled substances since July 31, 2019.

The record indicates that sometime in 2018, Breanna was placed on probation in connection with the crime of attempted possession of a controlled substance. By September 2018, she underwent a drug and alcohol evaluation conducted by a licensed therapist who recommended that she participate in what he described as "ASAM Level 2 requirements of Intensive Outpatient

Programming" and attend a "Stage of Change" group, which he described as a co-ed outpatient group to help participants make positive changes, better life choices, and change their behaviors for better well-being and functioning. Although Breanna initially enrolled in an intensive outpatient program and State of Change, various case notes indicate she failed to appear and complete those programs.

Between August 2, 2018, and January 17, 2019, Breanna tested positive for methamphetamine five times as indicated through tests conducted by DHHS. In January 2019, Breanna began drug testing through probation, and from January through April 2019, Breanna had 13 positive tests and only 3 negative tests.

In July 2019, Breanna was incarcerated for violating the terms of her probation and remained incarcerated until September 9. At that time, Breanna was granted a furlough so that she could attend inpatient treatment at Saint Francis Medical Center in Grand Island, which specialized in the treatment of substance abuse. Breanna was discharged from Saint Francis shortly thereafter on September 23 for "improper fraternization," and agreed to live at the Kearney Village which offered programs for individuals designed to assist with substance abuse, obtain employment, and other related counseling services. According to Heather Santiago, owner of Kearney Village, Breanna remained sober while living at the Kearney Village, obtained employment, and met with a therapist to address domestic violence issues, drug use, and trauma. This testimony is consistent with the testimony of probation officer Stamp who indicated that beginning in November 2019, she began testing Breanna three times per week, that she did not miss any drug tests during this period, and that she did not have any positive tests which Stamp administered.

In describing the overall progress Breanna has made to correct the conditions that brought about this court case, Koch testified that Breanna has done well maintaining her sobriety but has struggled with her mental health, understanding her children's trauma, and following through with recommendations and services. Koch testified that having the minor children wait in foster care until Breanna could demonstrate long-term sobriety and long-term stability was not in the children's best interests because Aniyah and Amaulo struggle with the unknown.

*iv. Therapy*

One of the case plan goals required Breanna to attend and complete sessions with a therapist to address domestic violence issues. Coates testified that from late July 2018 to October 2019, Breanna did not participate in therapy to address domestic violence despite being provided resources such as the S.A.F.E. Center and names of local counselors engaged in domestic violence counseling. Coates explained that the reason Breanna gave for not attending domestic abuse counseling was that the violence occurred between Breanna and her mother, not between her and the children's father. Coates testified that she believed counseling for domestic violence was still important for Breanna regardless of whether the violence was perpetrated by Breanna's mother or the father of her children.

Shortly after the commencement of this case, the children began participating in therapy to address their needs. In October 2018, Blaha began weekly individual therapy sessions with Aniyah. Blaha believed Aniyah had experienced trauma, feared hot objects, demonstrated issues with personal space by "get[ting] right up in your space," and struggled with appropriate boundaries because she viewed everyone, including strangers, as a safe person. Aniyah's trauma

included issues related to her father, grandmother, her parents fighting, Breanna and Aniyah's grandmother fighting, Breanna spanking her with a belt, and Breanna missing Aniyah's birthday party. At the beginning of therapy, Blaha observed Aniyah was in a hyperarousal state "almost like that fight or flight" which impaired Aniyah's daily functioning such as going to school or to a store. Blaha's initial therapy goals for Aniyah included for her to demonstrate improvement in regulation, strong emotions, and to explore and resolve key issues potentially at the source of her hyperarousal and dysregulation.

Over the course of 15 months of therapy, Aniyah became more regulated in controlling her actions, which Blaha partially attributed to Aniyah processing her trauma and reinforcement that Aniyah was in a safe environment. When asked if Aniyah encountered barriers to progress, Blaha mentioned that when therapy initially began, Aniyah still had visits with Breanna, which were inconsistent because Breanna would not attend or would cancel visits at the last minute. Blaha stated Breanna's ability or inability to attend those visits greatly impacted Aniyah's mental health and because these visits were scheduled on school days, Aniyah spent a lot of time during school worrying if she would see Breanna. Blaha noted that Aniyah parented Amaulo to help him when things were not going well and also "parented" her parents requiring Blaha to address Aniyah's role stating that it was not Aniyah's responsibility to take care of Breanna. Regarding Aniyah's current mental health, Blaha stated that Aniyah thrived on predictability because she felt safe and that she currently was doing "pretty well."

In October 2019, Blaha began weekly child and parent psychotherapy with Amaulo and his foster mother. Blaha was concerned about Amaulo's emotional regulation because he exhibited more anger and aggression in his play, which she explained may have surfaced after he had passed "the clinical failure-to-thrive category a little bit with his -- the medical need." Blaha met with Amaulo for 10 weeks, and although his emotional vocabulary was developmentally lagging, he was showing some progress in that area. However, a setback occurred when Blaha told Amaulo that Breanna had been released from jail, and he began scratching himself, banging his head, and became very clingy with his foster mother, such as wanting to sleep in her bed and not be away from her. After learning that Breanna had been released from jail, Amaulo seemed to experience high levels of distress wondering if he would be removed from his foster parents' home.

Also in October 2019, Blaha began therapy with Breanna during which Breanna was open about her addiction, her time at Kearney Village, and her inpatient treatment. Blaha learned Breanna had not begun counseling because she lacked funds, so Blaha informed her about the S.A.F.E. Center where Breanna could start counseling. Blaha recommended, for the best interests of the children, that Breanna attend therapy with her to show consistency and stability, that she provide clean urine tests, and that she follow the drug evaluation recommendations. Blaha explained that immediately starting visits between the children and Breanna was not in the children's best interests because of the high risk of regression in the children's emotional stability and mental health and that not having a safe person there to reintroduce Breanna to the children could damage their relationship. In November 2019, the parties stipulated Breanna needed to engage in therapeutic sessions with Blaha to enable Blaha to determine when visits between Breanna and her children could begin.

Out of 10 sessions scheduled with Blaha, Breanna attended 5 sessions, cancelled 3 sessions, and missed 1 session. Blaha testified that Breanna did not meet her expectations due to her

inconsistency, lack of followthrough, and excuses. Blaha explained that those behaviors are difficult on the children. Blaha stated that Breanna had not reached the point where the children's best interests would be served by having a therapeutic visit with Breanna.

Blaha was asked whether Breanna could meet her children's needs, at which point Breanna objected stating:

> Judge, I don't have any problems with . . . Blaha's qualifications at all, but I just don't believe that under Rule 702 that she has enough information here to offer that opinion, you know, without seeing the parent and the children interact with each other. And not even once do we have. So that's a due process problem, Judge, and so that's the basis of the objection.

The State argued that while Blaha had not worked with Breanna and the children in any combined sessions, Blaha has worked with Aniyah in individual counseling for over a year, with Amaulo for 10 sessions, and with Breanna for 5 sessions giving her the ability to opine whether Breanna could meet her children's needs. The court overruled Breanna's objection based on Blaha's therapeutic relationship with the children. Blaha then testified that based on her observations of Breanna's interactions with the children in the waiting room, Amaulo's past trauma and many medical needs, and Aniyah's past trauma, the children need predictability, consistency, and safety, which Breanna cannot provide. Blaha elaborated that Aniyah's and Amaulo's needs include knowing where their home will be and who will protect them because otherwise these unmet needs lead to anxiety and depression. Blaha explained Aniyah's and Amaulo's needs are being met by their foster parents. Additionally, Blaha noted Breanna has shown little improvement since the beginning of this case and has not exhibited sufficient consistency to support reunification with her children.

### v. Visitation

Coates was assigned to this case from late July 2018 to around October 2019. Within the first week of being assigned this case, Coates offered Breanna family support services including assistance in finding employment and housing, completing a drug evaluation, and supervised visitation. Supervised visitation began August 6, 2018, and occurred three times per week for approximately three to four hours. However, Breanna canceled her first scheduled visit because she was doing laundry out of town. Breanna also canceled the August 13 visit due to illness. In September, Breanna was allowed three visits per week but missed two visits claiming on one visit that she was moving, and for the other visit, she was out of town. In October and November, Breanna was still scheduled to receive three visits per week but missed three visits in October and four visits in November.

In December 2018, Breanna's scheduled visits decreased to twice per week for three hours each at her request because she needed time to find employment and housing. Breanna missed two visits in December. During January, February, March, and April 2019, Breanna was scheduled to have two visits per week but missed six visits in January, one in February, two in March, and three in April. No visits were scheduled in May because Breanna stopped contacting the visitation worker and no one knew where Breanna was. Breanna's last visit was on April 30, but the foster mother bought Breanna a ticket to Aniyah's dance recital on June 1, which Breanna attended.

Eventually, due to Breanna's inconsistency in attending visits, she was required to call prior to her visits to confirm she would attend. Breanna testified that law enforcement took her cell phone when she was arrested, which was not returned until December 2019. Breanna explained she had difficulty with her cell phone because it was "basically" broken which interfered with her ability to confirm visits until she eventually obtained a new phone.

Coates testified that she was never in a position to recommend anything other than supervised visits because, although Breanna was provided with family support throughout the pendency of the case to work on her parenting skills, Breanna did not display improvement in parenting skills, was homeless throughout the pendency of the case, and had a few positive drug tests. Further, although the family support worker addressed parenting skills and programs with Breanna during her visits, Breanna needed constant redirection and did not parent her children. Coates also testified that she was never in a position to recommend reunification because Breanna did not make any progress and lacked followthrough. Coates testified that returning children to a parent who has not made any progress in addressing the conditions that brought them to the court's attention leads to a risk of retraumatizing the children and removing the children from the parent's care again. Coates testified reunification was not in the children's best interests because Breanna lacked followthrough in completing court-ordered requirements and she would not be able to care for Amaulo's medical needs due to her failure to attend the majority of his medical appointments.

Blaha also explained there was a process for moving from therapeutic visitation to supervised visitation to unsupervised visitation prior to reunification. Blaha testified that in order for visitation to progress from therapeutic visits to supervised visits, she would have to perform an assessment of how the sessions were progressing and how the children were behaving at the foster home and at school.

### 2. COURT ORDER TERMINATING PARENTAL RIGHTS

In July 2020, the court found that the State met its burden by clear and convincing evidence, that the conditions found in subsections (2), (3), and (6) of § 43-292 existed, and that termination of Breanna's parental rights was in the minor children's best interests. The court noted that Amaulo is a young child with severe medical needs, that Breanna missed many of Amaulo's medical appointments during the course of the case, she missed visitations, drug tests, and she tested positive for methamphetamine on several occasions, and that Breanna placed her own interests above her children's interests. Further, the court noted that up until January 2020, she did not demonstrate any progress on any of the goals set forth in the case plans, her compliance was minimal, and she did not demonstrate the ability to provide a suitable home and other care necessary for the well-being of the children.

### III. ASSIGNMENTS OF ERROR

Breanna's assignments of error, restated, are that the court erred in (1) allowing expert testimony by the children's therapist concerning Breanna's ability to parent and to meet her children's needs without proper foundation, (2) finding Breanna failed or refused to take advantage of the services offered by DHHS to correct issues or attain goals set out in the court-ordered case plans, and (3) finding the termination was in her children's best interests.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. ALLOWING TESTIMONY BY CHILDREN'S THERAPIST WITHOUT PROPER FOUNDATION

First, we address Breanna's assignment of error that the court erred in "allowing expert testimony by [the children's] therapist . . . Blaha in regard to [Breanna's] ability to parent and meet her children's needs without proper foundation established as required by Nebraska Rule of Evidence 702." Brief for appellant at 1.

During the termination hearing, when Blaha was asked whether Breanna could meet her children's needs, Breanna objected, stating:

> Judge, I don't have any problems with . . . Blaha's qualifications at all, but I just don't believe that under Rule 702 that she has enough information here to offer that opinion, you know, without seeing the parent and the children interact with each other. And not even once do we have. So that's a due process problem, Judge, and so that's the basis of the objection.

Before addressing Breanna's assigned error that the evidence should be excluded under Neb. Rev. Stat. § 27-602 (Reissue 2016), Neb. Rev. Stat. § 27-702 (Reissue 2016), and on due process grounds, we first pause in order to review the evidentiary standards governing termination of parental rights hearings. In setting that standard, the Nebraska Supreme Court held:

> We note that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *In re Interest of Destiny A. et al., supra.*

> Rather than the formal rules of evidence, we evaluate the admission of evidence in termination of parental rights cases using a due process analysis. *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Rebecka P., supra.*

*In re Interest of Becka P. et al.*, 27 Neb. App. 489, 505-06, 933 N.W.2d 873, 886 (2019).

Here, since evidentiary rules are not applicable to termination of parental rights hearings, we need not consider Breanna's argument that the court erred in applying § 27-602 and § 27-702. We further find that Breanna's due process rights were not violated by Blaha's testimony. Breanna was given notice of the termination hearing, she was given reasonable opportunity to refute or defend against the allegations contained in the petition to terminate her parental rights, she was given a reasonable opportunity to confront and cross-examine adverse witnesses including Blaha and to present evidence on the allegations contained in the petition to terminate her parental rights, she was represented by counsel, and the hearing was held before an impartial decisionmaker. Thus, Breanna was afforded her rights of due process as it relates to this witness and testimony, and this assigned error fails.

## 2. STATUTORY BASIS FOR TERMINATION

Next, Breanna contends the court erred in finding she failed or refused to take advantage of the services offered by DHHS to correct issues or attain goals set out in the court-ordered case plans. Breanna's assigned error that the court erred in finding that she failed or refused to take advantage of services to correct issues or attain goals relates only to termination pursuant to § 43-292(6). That subsection provides that "[f]ollowing a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination." However, the court separately determined that the conditions set forth in § 43-292(2) (parent substantially and continuously or repeatedly neglected and refused to give juvenile necessary parental care and protection) and § 43-292(3) (financially able parent willfully neglected to provide juvenile with necessary subsistence, education, or other care necessary for juvenile's health, morals, or welfare or neglected to pay for such subsistence, education, or other care when legal custody of juvenile is lodged with others and such payment ordered by court) were separately present here. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 87, 643 N.W.2d 401, 407 (2002) ("because we do not consider whether termination of [appellant's] parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Reissue 1998), which requires reasonable efforts to reunify families, is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292.") Breanna has not appealed the court's termination of her parental rights pursuant to § 43-292(2) and (3).

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Although Breanna has not challenged the termination of her parental rights under either § 42-292(2) or (3), having conducted a de novo review of the record, we find that there was sufficient evidence presented to support the county court's decision that termination of Breanna's parental rights was warranted pursuant to § 43-292(2).

Section 43-292(2) states that the court may terminate parental rights if "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but

common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

"One need not have physical possession of a child to demonstrate the existence of the neglect contemplated by § 43-292(2)." *In re Interest of J.N.V.*, 224 Neb. 108, 111, 395 N.W.2d 758, 761 (1986). "A parent may as surely neglect a child of whom she does not have possession by failing to put herself in a position to acquire possession as by not properly caring for a child of whom she does have possession." *Id*. at 112, 395 N.W.2d at 761. A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Here, based upon our de novo review of the evidence adduced at the termination hearing, the evidence established that since the removal of the children from Breanna's home in July 2018 until the February 2020 termination hearing held nearly 1½ years later, Breanna had failed to find a suitable residence for herself and her children, failed to regularly visit her children, demonstrated an inability to care for them, and failed to make any meaningful progress toward doing so. This includes, but is not limited to evidence that during this period of time, Breanna stayed with friends, was incarcerated for a period of time, and lived in a home but relied upon her mother to pay her rent. Further, despite Breanna having made some progress in her battle against drug dependency following her discharge from the Saint Francis center in Grand Island, as Koch noted in her testimony, Breanna continues to struggle with issues related to her mental health, grasping an understanding of her children's trauma and needs, following through with recommendations and services, and was a long way removed from demonstrating long-term sobriety and stability at a level in which she could effectively parent her children. As it relates to supporting her children, Breanna only obtained a part-time job a week prior to the termination hearing and admitted that the income from that job was insufficient to meet her expenses. Breanna has failed, in 1½ years, to provide an environment to which her children could return and this record is replete with evidence that Breanna substantially, continually, and repeatedly neglected her children as set forth in § 43-292(2).

Because any one ground of the eleven identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child, we need not consider whether termination of Breanna's parental rights was proper pursuant to the subsections (3) and (6) of § 43-292. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

### 3. BEST INTERESTS

Breanna's final assignment of error is that the court erred in finding termination of her parental rights was in her minor children's best interests. Breanna contends that because she was not given the opportunity to prove she could properly parent her children, the State failed to overcome the presumption that reuniting her children with her would be in the children's best interests. Breanna further argues that by the time this matter was heard by the court, she had controlled her addiction, obtained housing and employment and was working towards providing a safe and stable home for her children, which makes termination of her parental rights not in the children's best interests.

Before specifically addressing Breanna's assignment, we begin by setting forth the underlying basis for the best interest analysis. In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.
>
> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Amaulo and Aniyah were removed from Breanna's care on July 20, 2018, and have been in foster care since that time. Although Breanna has had supervised visitation throughout the duration of this case, she had cancelled numerous visits. Further, even after the number of her weekly visits was reduced at her request, she still cancelled visits with her children which eventually led to the requirement that she call to confirm she would be attending visitations. Breanna's last visit with her children was on April 30, 2019, because Breanna stopped contacting the visitation worker. According to Coates, she never recommended that Breanna's visitation move beyond fully supervised visits because Breanna did not display improvement in parenting skills, nor did she recommend reunification because Breanna failed to make any progress and lacked followthrough.

Breanna also failed to put herself in a position to provide her children with a safe and secure living environment. During the pendency of this case, Breanna has not provided proof to DHHS that she has obtained suitable housing. Neither Coates nor Koch were able to perform a walkthrough of Breanna's home to determine if visitation could occur. Further, during the course of the case, Breanna has either resided with friends, was incarcerated, or relied upon her mother to provide funding for her housing. Breanna continually had family support available to assist with housing, but Breanna did not regularly participate in family support. Breanna has clearly failed to put herself in a position of providing her children with a safe and secure living environment.

Likewise, Breanna provided limited proof of employment during the pendency of this case. Breanna testified that she worked at Cabela's from approximately September 2019 to December 2019, and then obtained employment one week before the termination hearing. DHHS case

workers acknowledged that from July 2018 to October 2019, Breanna held a job for two days and testified that although they discussed employment with Breanna during team meetings, Breanna never asked for assistance in obtaining employment or indicated a reason why she was unable to work. Further, Breanna attended only 12 of the 20 monthly team meetings despite the fact that her family support worker met with Breanna while Breanna was in jail and during inpatient treatment in order to review case plan goals. While the services outlined in the case plan possibly could have put Breanna in a position to parent her children, Coates testified that overall Breanna made minimal to no progress toward correcting the conditions that brought about the present case.

Amaulo has numerous medical issues requiring monthly medical appointments in Omaha. Although Breanna was authorized to attend Amaulo's medical appointments and was offered transportation assistance and gas vouchers, she attended only one appointment. Coates expressed concern that Breanna would not be able to bring Amaulo to his monthly doctor appointments in Omaha because she had previously failed to attend Amaulo's 4-month, 6-month, and 10-month followup appointments at a local doctor. Breanna's lack of attendance at his appointments is concerning regarding her ability to address his needs.

Additionally, Breanna's own struggle with drug addiction and mental health during this case impacts her ability to care for Amaulo and Aniyah. Breanna failed to complete an intensive outpatient treatment program, admitted to using marijuana, and tested positive for methamphetamine on numerous occasions. Koch testified Breanna has struggled with her mental health and understanding her children's trauma as well as following through with recommendations or services. Further, despite being provided resources, Breanna did not participate in therapy to address domestic violence issues. Although Breanna testified that she made progress in staying sober after engaging with Kearney Village for which we commend her, she continued to struggle with her mental health needs, failed to understand her children's needs, and failed to follow through on numerous other necessary services to address those needs.

Finally, both Amaulo and Aniyah have improved while in foster care. When Aniyah started therapy with Blaha in October 2018, she was in a hyperarousal state which impaired her daily functioning. However, over the course of 15 months in therapy, Aniyah has become more regulated in controlling her actions, which Blaha partially attributed to Aniyah processing her trauma. Blaha stated that Aniyah thrives on predictability because she feels safe and that she is doing "pretty well" currently.

In October 2019, Blaha began weekly child and parent psychotherapy with Amaulo and his foster mother to address Amaulo's emotional regulation because of the anger and aggression in his play. Blaha stated that Amaulo has made progress in his emotional vocabulary. When Blaha told Amaulo that Breanna was released from jail, he experienced a setback by scratching himself, banging his head, and became very clingy with his foster mother, such as wanting to sleep in her bed and not be away from her. Amaulo seemed to experience high levels of distress after Breanna's release from jail wondering if he would be removed from his foster parents' home.

Blaha testified that based on her observations of Breanna's interactions with the children in the waiting room, Amaulo and Aniyah's past trauma, Amaulo's many medical needs, and the children's need for predictability, consistency, and safety, Breanna simply cannot provide for these needs. Blaha elaborated that Aniyah's and Amaulo's needs included knowing where their home will be and who will protect them because these unmet needs lead to anxiety and depression.

Additionally, Blaha noted Breanna has shown little improvement since the beginning of this case and has not exhibited sufficient consistency to support reunification with her children. Blaha explained Aniyah's and Amaulo's needs are being met by their foster parents.

Similarly, Koch testified that extending the minor children's stay in foster care until Breanna can demonstrate long-term sobriety and long-term stability was not in the children's best interests because Aniyah and Amaulo struggle with the unknown. Coates testified that reunification was not in the children's best interest because Breanna lacked followthrough in completing court-ordered requirements and she would not be able to care for Amaulo's medical needs as evidenced by her failure to attend the majority of his medical appointments.

Based upon our de novo review of the record, the evidence establishes that during the 1½ years that this case has been pending, Breanna has failed to put herself in a position to parent her children. Although we have no doubt of Breanna's love for her children, she is unfit to raise her children, nor will she be able to obtain a level of fitness to raise her children in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Alec S.,* 294 Neb. 784, 884 N.W.2d 701 (2016). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parent's rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Amaulo and Aniyah deserve permanency which Breanna cannot given them.

## VI. CONCLUSION

Based on our de novo review of the record, we affirm the court's order terminating Breanna's parental rights.

AFFIRMED.